# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Portrait Homes - South Carolina, LLC and Portrait Homes - Persimmon Hill, LLC, Plaintiffs,

v.

Pennsylvania National Mutual Casualty Insurance Company and The Persimmon Hill Homeowners Association, Inc., Defendants,

AND

The Persimmon Hill Homeowners Association, Inc., Third-Party Plaintiff,

v.

Jose Castillo d/b/a JJA Framing and JJA Construction, Inc. d/b/a JJA Framing, Third-Party Defendants,

of which Pennsylvania National Mutual Casualty Insurance Company is the Appellant,

and

Portrait Homes - South Carolina, LLC, Portrait Homes - Persimmon Hill, LLC, and The Persimmon Hill Homeowners Association, Inc. are the Respondents.

Appellate Case No. 2020-000735

———————

Appeal From Berkeley County
Roger M. Young, Sr., Circuit Court Judge

———————

Opinion No. 6038

Heard May 2, 2023 – Filed December 13, 2023

---

**AFFIRMED**

---

David L. Brown and John Irvin Malone, Jr., both of Greensboro, North Carolina, for Appellant.

Phillip Ward Segui, Jr., of Segui Law Firm, of Mount Pleasant, and John T. Chakeris and Alicia Denise Pullano, both of Chakeris Law Firm, of Charleston, all for Respondent The Persimmon Hill Homeowners Association, Inc.

Stanley Clarence Rodgers, of Law Office of Stanley C. Rodgers, LLC, of Charleston, for Respondents Portrait Homes - SC, LLC and Portrait Homes - Persimmon Hill, LLC.

---

**KONDUROS, J.:** This very complicated case concerns insurance coverage under commercial general-liability (CGL) insurance policies, including claims of bad faith, arising out of underlying construction defect lawsuits when Penn National Mutual Casualty Insurance Company (Penn National) asserts its insured, a subcontractor, did not notify it of the lawsuits and declined coverage. We affirm.

**FACTS/PROCEDURAL HISTORY**

Persimmon Hill is made up of 388 townhome units contained in 74 buildings located in Goose Creek, South Carolina. The Persimmon Hill community is governed by recorded covenants and restrictions that impose rights and obligations on the Persimmon Hill Homeowners Association, Inc. (the HOA), including the duty to repair and maintain the exteriors of the townhomes and common areas. Portrait Homes[1] was the developer and general contractor of Persimmon Hill. JJA

---

[1] Portrait Homes is structured as various limited liability companies (LLCs). Portrait Homes - SC, LLC and Portrait Homes - Persimmon Hill, LLC (collectively, Portrait Homes) are the two named in this lawsuit. All of the Portrait Homes entities are subsidiaries of Pasquinelli Construction Company. Pasquinelli

Framing was the primary framer for Persimmon Hill and framed the vast majority of the units there; it installed wooden framing components, windows and doors, window and door flashings, and weather barriers in approximately 85% of the units. Jose Castillo owned and operated JJA Framing. JJA Framing worked as a subcontractor for several Portrait Homes projects in the Charleston area.

While JJA Framing was working on the Persimmon Hill project, articles of incorporation for JJA Construction, Inc. were filed with the North Carolina Secretary of State's Office. According to Castillo, the sole proprietorship known as JJA Framing and JJA Construction, Inc. were the same business and entity, having "the same location, same employees, same trucks, same telephone number[,] and same federal ID number."

Portrait Homes relied exclusively on subcontractors to construct its projects. To reduce the risk of exposure to lawsuits arising from a subcontractor's defective work, Portrait Homes (1) required each subcontractor to defend and indemnify Portrait Homes for claims arising from the subcontractor's work and (2) required each subcontractor to have Portrait Homes named as an additional insured on their liability insurance policies.

Portrait Homes accomplished this by entering into two types of contracts with subcontractors. The first, called a Master Agreement, was a gateway document that qualified a subcontractor to work for Portrait Homes on any project. The second, called a Housing and Purchase Order Contract, was specific to a particular project, such as Persimmon Hill. Both of the contracts had to be in place before a subcontractor could work on a project. While the form of the contracts was periodically updated, the substance of the hold harmless and insurance requirements did not change; the two agreements each required a subcontractor to defend and indemnify Portrait Homes. Both contracts governed a subcontractor's work at a particular project, and the hold harmless and insurance obligations in the two contracts were intended to be complementary. In 2002, Portrait Homes and JJA Framing signed a Housing and Purchase Order for the Persimmon Hill project as well as a Master Agreement.

Penn National issued policies to JJA Framing and JJA Construction, Inc. through the W. Lee Taylor Agency. Two policies, policy period 2003-04 and 2004-05,

Management, LLC and Pasquinelli Homebuilding, LLC are other Pasquinelli entities not parties to this appeal but appearing on some of the documents in this case.

provided Jose Castillo d/b/a JJA Framing Company as the named insured and listed Pasquinelli Construction Company; Pasquinelli Management, LLC; and Portrait Homes Construction Company as additional insured under endorsement CG 20 37 entitled Additional Insured - Owners, Lessees or Contractors - Completed Operations. On March 2, 2005, the named insured for the 2004-05 policy was changed to JJA Construction, Inc. Three policies, 2005-06, 2006-07, and 2007-08, listed JJA Construction, Inc. as the named insured and contained the additional insured endorsement 71 11 45 entitled Automatic Additional Insureds - Owners, Contractors and Subcontractors (Completed Operations).

In 2005, Portrait Homes received a certificate of insurance prepared by the W. Lee Taylor Agency relating to the 2005-06 Penn National Policy. It listed JJA Construction, Inc. and Jose Castillo as the insureds and Portrait Homes and Pasquinelli Management, LLC as additional insureds.

At some point, the Persimmon Hill townhomes began having issues with water intrusion. The professional engineer hired to investigate the issues believed the issues began two months after the certificate of occupancy was issued. In October 2012, a homeowner, on behalf of herself and other homeowners, and the HOA each brought suit against Portrait Homes. Both complaints were later amended to include Portrait Homes' subcontractors, including Jose Castillo d/b/a JJA Framing and JJA Construction, Inc. (collectively, JJA). Litigation continued for several years.

During the underlying Persimmon Hill litigation, Portrait Homes' insurance carrier, Admiral Insurance Company, agreed to defend it and retained Hood Law Firm to lead the defense. In June 2013, Hood Law Firm notified Penn National it believed JJA Framing's work contributed to the damages alleged in the lawsuits and demanded a defense and indemnification for Portrait Homes as an additional insured, referencing the 2005-06 Penn National policy.

On April 24, 2014, the HOA's counsel wrote Penn National transmitting both amended complaints and advising it if no answer were filed within fifteen days, an order of default and judgment would be sought against its insured, JJA.

In May 2014, after Hood Law Firm received no response from Penn National, it sent it another letter, this time referencing the 2004-05 Penn National policy, and repeated its demand for a defense and indemnification for Portrait Homes as an additional insured.

On September 30, 2014, Greg Gross responded to Hood Law Firm on behalf of Penn National and provided Penn National's coverage determination for Portrait Homes and the rationale for the decision:

> This is a completed operations type claim. As such, the sole avenue to additional insured status would be through an endorsement providing additional insured status for completed operations. The above noted policies do not contain such an endorsement. Accordingly, the tendering party, Portrait Homes-South Carolina, LLC do[es] not qualify as an additional insured for this occurrence. Therefore, Penn National Insurance is rejecting the aforementioned tender for defense and/or indemnity from Portrait Homes-South Carolina, LLC at this time.

Gross's letter was the only written communication Penn National sent in response to Portrait Homes' tender.

On December 29, 2014, while the underlying litigation was ongoing, Portrait Homes filed a declaratory judgment action against Penn National,[2] asserting it was an additional insured under various insurance policies issued to JJA for its work on Persimmon Hill. Portrait Homes also named the HOA as a defendant. On February 26, 2015, the HOA answered, alleging it was the assignee of Portrait Homes' claims for bad faith, and asserted cross-claims against Penn National for bad faith.

Eventually, the HOA settled its claims in the underlying litigation for a total of $8,569,790.71 against Portrait Homes and its subcontractors, with the exception of the claim against JJA. As part of the settlement, Portrait Homes settled the claims brought against it for $3,850,000. Portrait Homes' insurers, rather than Portrait Homes itself, paid the settlement. No appearance was made on behalf of JJA, and an order of default for JJA was filed December 23, 2014. A judgment of $4,156,976.89 was entered for the HOA against JJA on June 14, 2016. Subsequently, JJA assigned all of its rights as an insured under Penn National's policies, including any claims for bad faith, to the HOA based on the HOA's judgment against JJA.

---

[2] Many other insurance companies were also named as defendants.

On November 28, 2017, Portrait Homes filed an amended complaint naming Penn National and the HOA as the defendants.[3]  It alleged it was an additional insured under insurance policies Penn National had issued and Penn National had breached its duty to defend and its duty to indemnify.  The HOA filed an answer to the amended complaint, again asserting cross-claims for bad faith and also seeking a declaratory judgment that Penn National's policies provided insurance coverage to JJA, its insured.  Penn National filed answers to the amended complaint and to the HOA's cross-claims.

The trial court held a bench trial to determine if Portrait Homes was an additional insured under Penn National's insurance policies issued to JJA, whether the judgment obtained by the HOA against JJA was covered in whole or in part under Penn National's policies and whether Penn National committed bad faith along with the determination of damages, if any.  Following the trial, the trial court issued three well-reasoned and lengthy orders that we will attempt to summarize: one deciding the HOA's claims, one deciding Portrait Homes' claims, and one deciding Penn National's motion to alter or amend and the HOA's and Portrait Homes' claims for punitive damages and attorney's fees.

The order as to the HOA's claims "addresse[d] the determination of whether the judgment the HOA obtained against JJA is covered in whole or in part under Penn National's policies and whether Penn National acted in bad faith along with the damages, if any, for these claims."

The trial court found Penn National first became aware of the Persimmon Hill construction defect litigation by letter from Portrait Homes' counsel dated June 5, 2013, which included the amended complaint in the underlying lawsuit and the HOA's forensic engineering report.  The court provided the letter "put Penn National on notice of the HOA's claims against its insured JJA and Portrait[ Homes'] demand for additional insured status under the JJA insurance policies."  The court found Penn National assigned the claim to its adjuster, Gross, "an experienced claims handler in adjusting [CGL] claims."  The trial court determined that at the outset of the claim, Gross and Penn National knew after receiving the engineering report JJA's liability exposure in the underlying lawsuit was likely in the millions of dollars.  The court determined Penn National also knew the HOA's pleadings triggered coverage for JJA under the policies.  The trial court noted, "The HOA's complaint alleged, among other things, water intrusion caused damage

_____

[3] It also referenced the HOA as the third-party plaintiff and Castillo and JJA Construction, Inc. as the third-party defendants.

and deterioration to the townhomes as a result of improper construction to include the flashing and window installation performed by JJA" and "asserted claims of negligence, gross negligence, breach of warranties, and unfair trade practices against Portrait [Homes], JJA and other defendants."

The court noted that "fifteen . . . days after opening this claim, . . . Gross met with his superiors including his regional claim's office team leader, Gary Gibson, and Penn National's home office in-house legal counsel, Adam Parsons, to discuss the handling of this claim." The trial court found Penn National decided it would not retain counsel on JJA's behalf until JJA specifically requested a defense. The court determined "Penn National unilaterally imposed [a] requirement" on an insured "to specifically request a defense prior to Penn National hiring defense counsel," which "is separate and distinct from the notice and cooperation conditions found in the insuring agreement." The court observed "Gross testified that 'when a lawsuit is filed against a Penn National insured,'" two things must happen—the pleadings have to trigger coverage and the "'second hurdle [the insured must] jump through'" is "'to request a defense from Penn National.'" The court stated "Gross testified that this second hurdle was not a term or condition contained in any of the insuring agreements that he had ever seen at Penn National, and that he told management he did not believe imposing this requirement of specifically having to request a defense was proper." The court recognized Gross provided none of the four other insurance companies at which he had previously worked adjusting claims had this requirement.

The trial court found "Penn National's adjusting of the HOA's claims against JJA included attempting to send correspondence to JJA on three occasions and hiring an independent claims adjuster to cold call JJA to inquire whether JJA wanted Penn National to provide a defense." The court also found "Penn National's first effort to contact JJA was after its adjuster could not locate JJA's contact information in an internet search." The court noted e-mail and phone contact information for JJA were available in Penn National's system but it made no meaningful effort to locate this information. The court observed "Penn National's first correspondence was the first of three Reservation of Rights ('ROR') letters to JJA dated September 21, 2013, sent by certified mail to" an address in Ladson, South Carolina. The court noted that on that same day, "Penn National's adjuster made a claim's log entry: 'Effective 07/29/2009 the insured address is changed to" an address in Huntersville, North Carolina. The court also noted that "[t]he first sentence of the ROR states, 'Penn National Insurance acknowledges receipt of the above referenced claim.'" The court recognized "[t]he ROR further maintained that 'construction defects appear to be resultant in water intrusion and deterioration as a

result' and '[i]t appears from the contracts/purchase orders in the file that construction commenced in 2002.'" The court stated "Penn National noted the date of loss as December 5, 2003." The court determined, "The ROR was 'cut and paste' correspondence that also misapplied policy language for the Duty in the Event of an Occurrence Section that had been amended by an Extended Coverage Endorsement." The court also noted the ROR "state[d] it was 'not a denial of coverage, but rather to inform JJA of potential coverage issues.'" The court provided the ROR also stated, "'Any actions taken by Penn National in the investigation of this matter, or in negotiating for a compromise settlement, or in making any settlement, or in defending this claim, or in any way acting or failing to act, shall not constitute an admission of liability or an admission of coverage.'"

The trial court found that on the morning of Saturday, May 10, 2014, "Gayle McLeod[4] made a cold call on JJA by showing up unannounced and walking into the open garage of . . . Castillo's home in Huntersville, North Carolina, and knocking on his backdoor." The court noted McLeod testified she spoke with Castillo in his garage for ten minutes. The court stated "Castillo had not physically mailed the complaint to Penn National although Penn National knew the details of the claim." The court found "McLeod asked if JJA wanted Penn National to defend JJA in the underlying case but did not disclose any other relevant information" that Penn National already knew about the claim.[5]

The trial court noted all of JJA and Penn National's policies contained a Common Policy Conditions form. The form included a provision describing how any changes could be made to a policy:

> **B. Changes**
>
> This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make

---

[4] McLeod was an independent adjuster (IA) Gross hired initially to determine if JJA had been served. Later, she was instructed to (1) "[m]ake a cold call to the insured to inquire about suit representation," (2) inquire if the insured wanted Penn National to handle the suit on the insured's behalf, and (3) "[o]btain contact information on Jose Castillo."

[5] McLeod testified she asked Castillo if he wanted Penn National to defend him for these suits and he said no. She also testified that when she asked Castillo for contact information, he shook his head no.

changes in the terms of this policy with our consent.
This policy's terms can be amended or waived only by
endorsement issued by us and made a part of this policy.

The trial court found, "It is not disputed that coverage under the JJA policies was triggered by the HOA's complaint." The court recognized that the policies stated "Penn National 'will have the right and duty to defend the insured against suit.'" The court noted Penn National afforded no coverage, including a defense, to JJA because "JJA did not specifically ask Penn National to defend JJA in the litigation and . . . Penn National claimed JJA did[ no]t comply with the Duties in the Event of Occurrence, Claim or Suit section of the policy." The court also noted Penn National and JJA's insurance policies did not require JJA to request Penn National to defend it. The court found "imposing this additional 'hurdle' to coverage . . . [wa]s improper and not required to trigger a duty to defend under the JJA policies under South Carolina law . . . applicable to this case."

The trial court recognized that "[s]ubstantial prejudice can occur when an [o]rder of [d]efault or [d]efault [j]udg[]ment is entered against the insured and the insurer has no notice of the lawsuit." However, the trial court reasoned "[i]t would be inequitable to permit an insurer to avoid coverage for an innocent third party just because the insured did[ not] notify the insurer of the lawsuit." The court explained the purpose of providing notice is to allow the insurer to investigate and defend the lawsuit. Further, the court found "Penn National had notice of the claim against JJA even before JJA was served with the complaint." The court determined JJA's failure to comply with the notice provisions of the insuring agreements did not substantially prejudice Penn National because it was not prevented from investigating the HOA's claim against JJA. The court found Penn National never attempted to investigate the claim even though it had the opportunity to do so.

The trial court examined another lawsuit, *Lammey v. Carolina Builders & Reconstruction, LLC*,[6] which involved construction defects with a single-family home, in which Penn National provided JJA a defense. The trial court observed that in that case, "Penn National was put on notice by the [p]laintiff's counsel that JJA had been sued and served via publication[] and Penn National hired counsel to defend JJA." The trial court noted no evidence was presented in that case "that JJA specifically contacted Penn National to request a defense or contacted Penn

---

[6] *Lammey v. Carolina Builders & Reconstruction, LLC*, 2010-CP-10-00607 (Charleston Cnty., S.C., Ct. Com. Pl. Sept. 28, 2011).

National otherwise" but Penn National still "hired JJA a lawyer to provide JJA a defense."[7]  The trial court also noted an answer was filed on JJA's behalf in the *Lammey* litigation around two years before Penn National was put on notice of the Persimmon Hill claim.  The trial court reasoned the allegations against JJA in *Lammey* were similar to those in this case, except that *Lammey* involved a single-family residence instead of 388 townhomes.[8]

---

[7] Answer of Defendants JJA Construction, Inc. & Jose A. Castillo to Plaintiffs' Amended Complaint, *Lammey v. Carolina Builders & Reconstruction, LLC*, 2010-CP-10-00607 (Charleston Cnty., S.C., Ct. Com. Pl. Feb. 18, 2011).

[8] Additional cases exist involving Penn National and JJA.  One of those cases is a federal district court case in which the district court initially granted summary judgment due to JJA's failure to notify Penn National of the lawsuit, thereby prejudicing it.  *Commons of Grand Oaks Homeowners Ass'n v. Pa. Nat'l Mut. Cas. Ins. Co.*, No. 2:16-1668-BHH, 2019 WL 13257665, at *1 (D.S.C. Nov. 22, 2019).  However, following reconsideration, the district court vacated its grant of summary judgment.  *Id.* at *6.  In the initial order granting summary judgment, the district court found JJA's failure to communicate directly with Penn National had affected Penn National's rights under the insurance contract because that failure effectively denied Penn National the chance to investigate the claim with JJA's cooperation, hire counsel for JJA and experts, assert defenses, settle before entry of default or default judgment, and oppose a request for entry of default and a default judgment of $5,673,886.  *Id.* at *5.

However, in the reconsideration order, the court stated at least four lawsuits that arose out of similar construction defect claims named JJA as a defendant, which Penn National knew as JJA's insurer.  *Id.*  The court provided in its case, "Plaintiff's counsel first contacted [Penn National] in January 2011, and contacted [Penn National] several more times after JJA was served on April 2, 2011.  Default was entered as to JJA in the underlying lawsuit in January and February 2013."  *Id.* (citation omitted).  The court noted that "[d]uring this time, Penn National defended JJA in a similar construction defect case in Charleston County, in which JJA filed an answer in February 2011."  *Id.*  Accordingly, the court found Penn National "possessed more than mere knowledge of the underlying lawsuit[] and rather was in command of the facts pertaining to the claims and parties involved in the lawsuit."  *Id.*  The court noted Penn National "filed an answer on JJA's behalf in one of the several lawsuits concerning alleged construction defects in which JJA was a named defendant."  *Id.*  The court determined although "Castillo's failure to timely tender the summons and complaint to [Penn National] constitutes a breach of the policies," that failure "had little bearing on [Penn National's] ability to

The court further found Penn National's contention it "could not provide a defense without the insured specifically requesting one to be without merit and contrary to [its] prior actions including specifically with regard to JJA." The trial court found unpersuasive Penn National's contention "it was not required to provide JJA with a defense or indemnity because it was honoring JJA's wishes of not wanting a defense." The court noted that after Penn National knew JJA had been served, it hired an IA to cold-call JJA to see if JJA wanted Penn National to provide a defense in the litigation. The court found the IA, McLeod, arrived at Castillo's home unannounced on a Saturday morning. The trial court found Penn National directed McLeod to ask "Castillo an extremely important question for which his answer, unknowingly to him at the time, would result in a judgment of $4,156,976.89 against JJA." The court stated, "When asked if JJA wanted a defense in the pending Persimmon Hill litigation, the trial testimony was that Castillo responded that he did not."

The trial court found, "Important information known only to Penn National and not JJA was not disclosed to . . . Castillo when asking him to surrender an important and valuable policy benefit that had already been paid for with each of the eight years of policies"; "Penn National knew that the liability exposure to JJA was in the multi-millions of dollars, the severity of the defects and damages identified in

inform itself as to whether it should defend JJA in the underlying lawsuit because" it already knew many of the relevant facts. *Id.*

The district court stated the new evidence of Penn National's behavior, particularly that shown in testimony from the present case on appeal here, "pose[d] a pivotal question":

> Did [Penn National] embrace a corporate policy by which it provided a defense to JJA in the rash of construction defect lawsuits in which JJA was a named defendant only upon JJA's express request, notwithstanding the policy language, [Penn National's] duty to defend, or [Penn National's] overall knowledge of the nature of the litigation then-pending against JJA.

*Id.* Therefore, the district court determined "whether JJA's failure to act, in breach of the policies, caused [Penn National] substantial prejudice" presented "a question of material fact." *Id.*

the engineer's report and that the lawyer that would be providing the JJA defense was already a paid for policy benefit."  The court observed "Castillo testified [if] he [had] been told a lawyer would have been provided to JJA at no cost[,] th[en] he would have told the independent adjuster that JJA wanted a lawyer."  The court determined "Penn National's disclosure of only a small portion of information such as this would have changed . . . Castillo's answer to JJA wanting a defense as he had testified."

The trial court further found the record contains no evidence "Penn National provided any consideration to JJA in exchange for JJA allegedly agreeing to waive the valuable legal right of a defense which JJA had already paid and for which Penn National was obligated to undertake."  The court noted "the insuring agreement specifically provides that policy's terms which include Penn National having 'the right and duty to defend the insured against suit . . . ' can be amended or waived only by endorsement issued by Penn National and made a part of this policy."  The court accordingly determined "the duties and obligations of the parties to the insuring agreement can[no]t be altered orally."  Additionally, the trial court found that Penn National "breached the insuring agreement and the implied covenant of good faith and fair dealing" "by asking JJA to surrender the right to a defense while failing to disclose important and relevant information about the claim to its insured."  Accordingly, the trial court found "Penn National had a duty to defend JJA under each of the eight policies of insurance and that Penn National breached its duty to provide a defense."

The trial court also addressed Penn National's contention "it could not hire counsel for JJA without a specific request from JJA for a defense in part because a lawyer is ethically prohibited from filing an [a]nswer and defending an insured without speaking with the insured and obtaining authorization to do so."  The trial court first noted that "this argument do[es no]t take into account that JJA and Penn National have already agreed that Penn National has the right and obligation to defend JJA pursuant to the terms of the insuring agreement," and found "this defense is not contained anywhere within the ROR letters, Claims Log Entries, or ever been communicated to JJA prior to the judgment being obtained."  The court determined "this new argument was not part of any consideration for Penn National in not providing JJA defense and indemnity in the underlying case, and therefore, need not be considered."

The trial court determined Penn National's breach of all of the insurance agreements proximately caused an order of default to be entered against JJA and a damages award entered.  The trial court found Penn National owed indemnity for

the prior judgment in the amount of $4,156,976.89.  The court further determined Penn National was responsible for the interest that accrued after the entry of the judgment and the payment of the accrued interest on the judgment would not reduce the policy limits.  Accordingly, the court concluded the damages for the breach of the duty to defend and duty to indemnify were $4,156,976.89[9] plus postjudgment interest of $1,213,170.40 for a total of $5,370,147.29 for that cause of action.

The trial court found many of Penn National's actions were in bad faith and breached the duty of good faith and fair dealing to its insured.  The court found "Penn National's conduct, in addition to being in conflict with the insuring agreements of the policies, is the exact type of conduct that South Carolina bad faith law seeks to deter."  For the bad faith and breach of duty of good faith and fair dealing, the trial court awarded damages of $4,156,976.89, plus postjudgment interest of $1,213,170.40 for a total of $5,370,147.29.

The trial court also addressed Penn National's contention that the judgment should be subject to a time-on-risk analysis irrespective of Penn National refusing to defend and indemnify its insured.  The court reasoned that when the supreme court adopted the time-on-risk framework in *Crossmann II*,[10] it did not have to consider the insurer refusing to defend or indemnify because the insurer provided a defense in that case; instead, the question concerned only the amount of the indemnity obligation.  The court also noted the policies here contained different language than the policies in *Crossmann II*.  Accordingly, the trial court found the time-on-risk analysis "must be altered so that it is true to the language used in the insurance contracts at issue in the present case."  Accordingly, the trial court ruled that "the progressive property damage caused by continuous or repeated exposure to water intrusion occurring after the end of a policy period is deemed to be included in what is covered by the policy."

Additionally, the trial court found each of the eight Penn National policies provided coverage in the amount of $500,000 per occurrence.  The court therefore found $4 million of the HOA's judgment was covered under the Penn National policies as well as $1,213,170.40 in interest.  Accordingly, the trial court determined the HOA, as a judgment creditor, was entitled to damages of $4 million, plus postjudgment interest of $1,213,170.40, amounting to $5,213,170.40.

---

[9] This is the amount of damages entered in the default judgment action against JJA.
[10] *Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co. (Crossmann II)*, 395 S.C. 40, 59-64, 717 S.E.2d 589, 599-601 (2011).

The trial court ordered the HOA to submit an election of remedies within ten days of the entry of the order choosing between (1) the breach of the duty to defend and duty to indemnify and (2) bad faith and the breach of the duty of good faith and fair dealing. The trial court found the HOA as assignee of JJA's claims entitled to attorney's fees and costs pursuant to section 38-59-40 of the South Carolina Code (2015) and *Hegler v. Gulf Insurance Co.*[11] The trial court found both Portrait Homes and the HOA as assignee of JJA's policy rights were entitled to recover punitive damages against Penn National and a hearing would be conducted at a later time to determine the amount of the punitive damages.

In the trial court's order pertaining to Portrait Homes' causes of action, the trial court concluded Penn National breached its duty to defend, breached its duty to indemnify, and acted in bad faith by denying Portrait Homes' claim to be an additional insured under five Penn National policies. The trial court determined Portrait Homes was entitled to recover the attorney's fees and costs it had spent defending the underlying lawsuits and the amount paid to settle the claims up to the policy limits on the Penn National policies. The trial court also found Portrait Homes was entitled to prejudgment interest on both awards, attorney's fees and costs, and punitive damages.

First, the trial court determined Portrait Homes was entitled to additional insured coverage under two endorsement types: (1) 71 11 45 entitled Automatic Additional Insureds - Owners, Contractors and Subcontractors (Completed Operations) and (2) CG 20 37 entitled Additional Insured - Owners, Lessees or Contractors - Completed Operations. Endorsement 71 11 45 provided additional insured coverage in material part as follows:

> Any person(s) or organizations(s) (referred to below as additional insured) with whom you are required in a written contract or agreement to name as an additional insured for the "products-completed operations hazard[,"] but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work[,"] at the location or project designated and described in the contract or agreement, performed for that additional insured and included in the "products-completed operations hazard[."]

---

[11] 270 S.C. 548, 550-551, 243 S.E.2d 443, 444 (1978).

A person's or organization's status as an additional insured under this endorsement ends when the obligation to provide additional insured status for the "products-completed operations hazard" in the written contract or agreement ends.

The court recognized Portrait Homes asserted it had sufficient written contracts to qualify as an additional insured under this endorsement based on the Master Agreement and the Housing Purchase Order Contract. However, the court noted Penn National's home office counsel, Adam Parsons, disagreed. The court observed that prior to Gross sending the denial letter to Portrait Homes, Parsons sent Gross an email reasoning that because JJA Construction, Inc. was the named insured on the three policies containing Endorsement 71 11 45, and because the written contract for the Persimmon Hill project was between Portrait Homes and JJA Framing or Jose Castillo d/b/a as JJA Framing, the written contract did not qualify Portrait Homes as an additional insured. The court determined that at trial, Penn National relied on this argument as the primary basis for denying Portrait Homes' tender with respect to Endorsement 71 11 45.

The trial court found discrepancies in the documents in Penn National's underwriting file[12] revealed Jose Castillo d/b/a JJA Framing—the named insured under the first three Penn National policies—was intended to continue to be insured under the policies issued to JJA Construction, Inc. The trial court noted that on the declarations page of each JJA Construction, Inc. policy, Penn National chose to describe the form of business for the named insured as "INDIVIDUAL." The trial court observed that the document submitted to change the named insured on the 04-05 policy to JJA Construction, Inc. had information filled in for the "name change only" portion but none for the "formation of a new entity" portion. The trial court noted the exact same information in the three prior policies remained for all of the subsequent policies Penn National issued to JJA Construction, Inc. Thus, the trial court stated that "while Parsons was *technically* correct that Portrait Homes did not have a written contract with the named insured listed on the 2005-07, 2006-07, and 2007-08 policies, Parsons was *substantively* incorrect because the party with whom Portrait Homes did have a contract—Jose Castillo d/b/a JJA Framing—was intended to be insured under those policies." The

---

[12] The trial court noted Parsons admitted at trial he did not review the documents in the underwriting file as a part of his analysis of Portrait Homes' additional insured tender.

trial court determined "[t]he evidence convincingly supports the conclusion Jose Castillo d/b/a JJA Framing was intended to be insured under the policies issued to JJA Construction[,] Inc."

Additionally, the trial court observed that the underlying lawsuits alleged both Jose Castillo and JJA Construction, Inc. were doing business as JJA Framing. The trial court noted that "[f]or purposes of determining whether a duty to defend was owed to Portrait Homes, Penn National was required to take those allegations as true." The trial court cited several exhibits that showed (1) Gross recognized the underlying lawsuits alleged both Jose Castillo and JJA Construction, Inc. were doing business as JJA Framing and (2) Gross provided that information to Parsons. The trial court concluded that "[b]ecause the contracts between Portrait Homes and JJA Framing bound both Jose Castillo and JJA Construction[,] Inc., the requirement under endorsement 71 11 45 that there be a written contract with the named insured was satisfied."

The trial court also found the Master Agreement and the Housing and Purchase Order Contract both applied to the Persimmon Hill project. The trial court ruled the certificate of insurance prepared by the Taylor Agency relating to the 05-06 policy was "relevant because it show[ed] the parties believed the referenced policy (2005-06) provided additional insured coverage to Portrait Homes, and that belief could only be true if the parties believed the contracts between JJA Framing and Portrait Homes also bound JJA Construction[,] Inc.—the named insured under the 2005-06 policy." The trial court concluded the Taylor Agency was acting for both JJA Framing and Penn National and the information contained on the certificate was relevant and could be viewed as a piece of evidence.

Regarding Endorsement CG 20 37, which was attached to the 2003-04 and 2004-05 policies, the trial court noted it did not require a written contract or agreement; instead, it contained a schedule for a name and location. The court recognized that in the endorsements attached to the 2003-04 and 2004-05 policies, the named insureds were Pasquinelli Construction, Co.; Pasquinelli Management, LLC; and Portrait Homes Construction Company. The court also observed that the location of completed operations was listed as 3000 Colvard Parkway, Charlotte Mecklenburg, North Carolina 28269. The court noted that in an email to Gross, Parsons reasoned Portrait Homes did not qualify as an additional insured under this endorsement because it only applied to Castillo's work at 3000 Colvard Parkway.

The trial court found the address listed was an obvious scrivener's error for two reasons: (1) it was Jose Castillo d/b/a JJA Framing's own address and (2) it was

listed as the same address in another policy issued to JJA Framing for a different project. The court also noted the certificate of insurance issued by the Taylor Agency relating to Endorsement CG 20 37 in the 2004-05 policy had "Work done for the above referenced organization" as the location and description of completed operations. Therefore, the trial court determined the parties intended the additional coverage to apply to all projects where JJA Framing performed work on Portrait Homes' behalf and implied that term into Endorsement CG 20 37 to fill in the blank left after striking the obvious mistaken location.

Penn National also argued Portrait Homes did not qualify as an additional insured under Endorsement CG 20 37 because the names of the tendering parties did not match the names listed on the endorsement. The names of the tendering parties were "Portrait Homes - South Carolina, LLC, Portrait Home - Persimmon Hill, LLC, Pasquinelli Homebuilding, LLC." The trial court noted the structure of the Pasquinelli/Portrait Homes organization, which consisted of a Pasquinelli entity at the top, then Portrait Homes Construction Company. Below that, a limited liability company was formed for each state, followed by a limited liability company for each specific project. The trial court concluded the list of names in the endorsement was intended to encompass the state-specific and project-specific entities.

Regarding Portrait Homes' status as an additional insured under the Penn National Policies, the trial court also analyzed Gross's denial letter. In the letter, Gross stated Penn National was denying coverage because the policies did not contain an endorsement providing additional insured status for completed operations. The court noted several witnesses testified that reason was inaccurate. The trial court also noted the letter was the only communication Penn National ever sent to Portrait Homes.

The trial court discussed our supreme court's decision in *Harleysville Group Insurance v. Heritage Communities, Inc.*, which noted: "A reservation of rights letter must give fair notice to the insured that the insurer intends to assert defenses to coverage or to pursue a declaratory relief action at a later date." 420 S.C. 321, 338, 803 S.E.2d 288, 297 (2017) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996)). Accordingly, the trial court determined here, "Whatever can be waived by a deficient denial letter has been waived by Penn National's denial letter. Penn National has waived the ability to assert any exclusions or limitations on coverage."

Regarding the claim for breach of the duty to indemnify, Penn National contended it failed as a matter of law because Portrait Homes' insurers, rather than Portrait Homes personally, paid the $3,850,000 settlement with the plaintiffs in the underlying construction defect.  The trial court determined "South Carolina law does not support Penn National's argument."

Next, the trial court found it needed to modify the time-on-risk analysis from *Crossmann II* because the Penn National policies contained different language than the policies in that case.  The trial court noted the supreme court had adopted the time-on-risk doctrine in *Crossmann II* to approximate "the damage that occurred during a particular policy period."  The trial court also found the "basis for the doctrine rest[ed] in the language of the liability policies at issue in *Crossmann II*, which required coverage only for property damage that occurred during the policy period."  However, the Penn National policies contained a new provision that the policies in *Crossmann II* did not have.  The new provision stated, "'[P]roperty damage' which occurs during the policy period . . . includes any continuation, change or resumption of that . . . 'property damage' after the end of the policy period."

As a result, the trial court explained "the progressive property damage caused by continuous or repeated exposure to water intrusion occurring *after* the end of a policy period is deemed to be included in what is covered by the policy."  The trial court determined the portion of the overall damages[13] recoverable in each of the five policy years exceeded the limit of each policy, which was $500,000.  The trial court concluded the total amount covered by the Penn National policies was $2.5 million.[14]

Next, the trial court considered whether Penn National's conduct amounted to bad faith.  The trial court noted "Penn National had a good faith duty to perform a reasonable investigation into Portrait[ Homes'] claim for coverage as an additional insured."  The trial court reiterated that Penn National's "underwriting file contained a significant amount of information . . . that was important in" analyzing whether the policies covered Portrait Homes and that information "conclusively showed . . . Portrait [Homes] should have been treated as an additional insured under the JJA policies."  The trial court recognized the information also conflicted with Penn National's rationale for denying Portrait Homes' claim and Penn

[13] The overall damages were $3.85 million as provided by the settlement amount.
[14] The trial court's posttrial order included an exhibit detailing the allocation of damages per unit by year.

National did not meaningfully attempt to review or consider the contents of the underwriting file even though it was always available. The trial court also noted McLeod failed to ask Castillo any questions about Portrait Homes' claim during her brief interaction with Castillo at his home. The trial court also observed Penn National took seventeen months to respond to Portrait Homes and in the response provided only a false reason for denying coverage.

The trial court found "Penn National knowingly misrepresented the coverages under the policies to Portrait" Homes and unreasonably denied Portrait Homes' claim in bad faith. Further, the trial court found Penn National's actions were willful and in reckless disregard of Portrait Homes' rights. The court also found by clear and convincing evidence punitive damages were appropriate.

On October 31, 2019, Penn National filed a motion to alter or amend pursuant to Rule 59(e), SCRCP. As to Portrait Homes, Penn National asserted the trial court "improperly look[ed] beyond the plain terms of the policies and Castillo's contract with entities in the Portrait Homes corporate structure to ascertain the parties' 'intentions' when the contractual terms are unambiguous," "[t]hus, the court's finding that Portrait Homes is an additional insured under either of the additional insured endorsements (CG 20 37 or 71 1145) attached to the various policies is improperly premised on evidence beyond the contracts." Additionally, Penn National argued the trial court improperly found (1) "Penn National waived its right to contest coverage and that such waiver operated to extend coverage to uncovered risks, at odds with South Carolina law"; (2) "Penn National engaged in insurance bad faith based upon the behaviors it identified in its order"; and (3) "Portrait Homes sustained damages in the amount of its underlying settlement as a result of the conduct it found supported its claim against Penn National for insurance bad faith." Further, Penn National contended "the entry of damages on Portrait Homes' breach of contract claim is at odds with published South Carolina case law finding that a party completely indemnified for his loss sustains no damage for breach of an insurance contract." Finally, Penn National maintained "[t]he court failed to find by clear and convincing evidence that Penn National engaged in willful, reckless, or wanton conduct or that Penn National acted in willful and reckless disregard of Portrait Homes' policy rights and, as such, its award of punitive damages was improper."

As to the HOA, Penn National argued the trial court erred by failing to (1) "account for the legal ramifications of Castillo's declining a defense from Penn National, which relieved it of its duty to defend him"; (2) "find that Castillo's behavior amounted to a breach of the policy requirement of notice"; (3) "find that

Castillo's behavior amounted to a breach of the policy requirement of cooperation with Penn National's investigation"; (4) "find that Castillo's violation of his duties to notify . . . and to cooperate . . . substantially prejudiced Penn National" and accordingly "[d]efault judgment was entered against Castillo because of his violations of these duties, which [wa]s prejudicial as a matter of law"; and (5) "find by clear and convincing evidence that Penn National engaged in willful, reckless, or wanton conduct or that Penn National acted in willful and reckless disregard of Castillo's or JJA['s] . . . policy rights and" as a result improperly awarded punitive damages.  Additionally, Penn National asserted the trial court improperly (1) "found that Penn National engaged in insurance bad faith based upon the behaviors it identified in its order," (2) "found that Castillo sustained damages as a consequence of the bad faith behaviors," and (3) "fail[ed] to show how Penn National's behavior caused $5,370,147.29 in damages to Castillo and JJA."

As to both Portrait Homes and the HOA, Penn National contended the trial court improperly awarded damages under the time-on-risk doctrine.  Penn National asserted the court's orders implied the *Crossmann II* analysis no longer applies but did "not specify how it should change or provide the methodology for how it was applied in this case."  Further, Penn National argued "the proper date upon which damage is deemed 'complete' is the date that the responsible party compensates the injured plaintiff for the damage (or the date upon which damage is repaired, if repairs occur first)."

A hearing was held on January 15, 2020, to determine the amount of punitive damages pursuant to section 15-32-520 of the South Carolina Code (Supp. 2022).

On March 23, 2020, the trial court issued an order deciding (1) Penn National's 59(e) motion to alter or amend; (2) Portrait Homes' request for attorney's fees and costs; (3) the HOA's request for attorney's fees and costs; and (4) the punitive damages.  The trial court denied Penn National's 59(e) motion, "[w]ith the exception of an issue relating to the interplay between the award to Portrait Homes for breach of contract relating to the duty to indemnify and the award to [the] HOA as a judgment creditor."  The trial court awarded attorney's fees and costs as well as punitive damages to both Portrait Homes and the HOA.

In regards to Penn National's contention the court improperly found it had "waived its right to contest coverage and that such waiver operated to extend coverage to uncovered risks, in reliance on *Harleysville Group Ins[urance]*," the trial "[c]ourt conclude[d] the requirements discussed in *Harleysville* applied to coverage communications in general from an insurer to an insured, not just to a [ROR]

letter."  However, the trial court also ruled that if the requirements in *Harleysville* do not apply to denial letters in general, they still applied "to Penn National in this case because [it] agreed [to] the obligations to thoroughly and accurately explain the grounds for its decision applied to [Gross's] denial letter to Portrait Homes." Finally, the court clarified it "did not rule Portrait Homes was entitled to coverage under the Penn National policies based on . . . waiver."  The court reiterated Portrait Homes was obligated "to prove it met the requirements to trigger coverage under the additional insured endorsements and the insuring agreements" and it found Portrait Homes met its burden of proof.

As to Penn National's reiteration of its argument "Portrait Homes' claim for breach of the duty to indemnify fails as a matter of law because the settlement on behalf of Portrait Homes was paid by insurers . . . who issued policies directly to Portrait Homes, rather than having been paid by Portrait Homes personally," the trial "[c]ourt adhere[d] to its original ruling."  The trial court considered a similar federal case[15] in which the district court granted Penn National summary judgment, but it declined to follow the district court's reasoning, noting the federal case had actually begun two years after the current case.  Additionally, the trial court distinguished two cases Penn National cited[16] because they involved parties seeking to recover for defense costs rather than indemnity.  The trial court found another case, *Otis Elevator, Inc.*, more instructive.  *See Otis Elevator, Inc. v. Hardin Constr. Co. Grp.*, 316 S.C. 292, 450 S.E.2d 41 (1994).  In that case, our supreme court determined the trial court had erred by reducing the jury's verdict to offset the amount that an insurer had paid in settlement.  *Id.* at 300, 450 S.E.2d at 45.  Here, the trial court noted the supreme court's statement from *Otis Elevator, Inc.* that "if one party is entitled to indemnity from another, the right to indemnity is not defeated by the fact that the loss to be indemnified for was actually paid by an insurance company."  *Id.* at 300, 450 S.E.2d at 45-46 (quoting *Tillman v. Wheaton-Haven Recreation Ass'n*, 580 F.2d 1222, 1230 (4th Cir. 1978)).  The trial court observed that here, Penn National was arguing the opposite: that Portrait Homes' right to indemnity from Penn National was defeated by the fact that the loss being indemnified for was paid by an insurance company.

---

[15] *Summer Wood Prop. Owners Ass'n v. Pa. Nat'l Mut. Cas. Ins. Co.*, No. 2:17-cv-3504-BHH, 2019 WL 4415805 (D.S.C. Sept. 16, 2019).

[16] *Sloan Constr. Co. v. Cent. Nat'l Ins. Co. of Omaha*, 269 S.C. 183, 236 S.E.2d 818 (1977); *Harford Accident & Indem. Co. v. S.C. Ins. Co.*, 252 S.C. 428, 166 S.E.2d 762 (1969).

As to Penn National's contention in its 59(e) motion that the trial court erred in failing to find it was relieved of its duty to defend, the trial court found very few similarities between the cases on which Penn National relied[17] and the facts of this case. The court explained the common thread in those cases was that each of the insurers had hired counsel to provide a defense for their insureds, whereas Penn National chose not to do that in this case.

The trial court also found Penn National relied on McLeod to establish it "conveyed full and complete information to JJA regarding pertinent facts of the claim, policy provisions[,] and information regarding coverages." However, the trial court noted McLeod's testimony demonstrates it reasonably found Penn National misled Castillo by not providing him with all the information as to coverages available to him for which he had already paid premiums as well as not disclosing that he faced a multi-million-dollar exposure for this claim.

In its award of attorney's fees to Portrait Homes, the trial court evaluated the factors[18] the trial court must consider in awarding attorney's fees. The trial court found (1) presentation of the issues was not a simple task; (2) the amount of time and labor devoted to the case was reasonable; (3) Portrait Homes' attorney tried the case in a competent, well-prepared manner; (4) the contingency of compensation did not apply because the fee agreement was a billable hour arrangement; (5) the hourly rate of $250, as well as a rate of $125 for travel, was within the range of customarily charged in the area; and (6) the results were very beneficial. The trial court awarded attorney's fees of $237,462.50 and costs of $12,540.76 for a total of $250,003.26 to Portrait Homes.

As to the HOA's request for attorney's fees and costs, the trial court made findings pursuant to *Baron Data Systems, Inc.* For the HOA's assigned breach of duty to defend and duty to indemnify, the trial court found costs of $51,332.03 and

---

[17] *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365 (4th Cir. 2005); *State Nat'l Ins. Co. v. Eastwood Constr. LLC*, No. 6:16-cv-02607-AMQ, 2018 WL 8787543 (D.S.C. Sept. 5, 2018); *Tucker v. State Farm Mut. Auto. Ins. Co.*, 232 S.C. 615, 103 S.E.2d 272 (1958).

[18] Those factors are (1) the nature, extent, and difficulty of the legal services rendered, (2) the time and labor necessarily devoted to the case, (3) the professional standing of counsel, (4) the contingency of the compensation, (5) the fee customarily charged in the locality for similar legal services, and (6) the beneficial result obtained. *Baron Data Sys., Inc. v. Loter*, 297 S.C. 382, 384-85, 377 S.E.2d 296, 297 (1989).

attorney's fees $1,790,049.10 was reasonable and would be awarded if the HOA had elected the remedy for the breach of the duties to defend and indemnify. However, the trial court noted the HOA filed an election of remedies on November 1, 2019, in which it elected bad faith and the breach of duty of good faith and fair dealing rather than the breach of duty to defend and duty to indemnify. The court recognized the supreme court has held attorney's fees pursuant to section 38-59-40 of the South Carolina Code only apply to breach of contract actions, citing *Nichols v. State Farm Mutual Auto. Insurance Co.*, 279 S.C. 336, 306 S.E.2d 616 (1983).

The trial court awarded punitive damages of $3,892,791.24 to Portrait Homes. The court found "Penn National failed to perform a reasonable investigation of th[e] claim and knowingly misrepresented coverages under the policies to Portrait [Homes] in the claim denial." The court further found "Penn National's claim denial was unreasonable and untimely in taking seventeen months . . . following Portrait[ Homes'] initial tender to process the doomed claim. The evidence is clear and convincing that this conduct of Penn National was willful, wanton, or in reckless disregard of Portrait[ Homes'] rights causing harm."

The trial court awarded the HOA, as assignee of JJA's claim, $5,370,147.29 in punitive damages. The trial court found "Penn National had the opportunity to investigate the claim and provide a defense to JJA but chose not to." The court found that because of Penn National's failure to provide a defense, an order of default was entered against JJA—nearly nineteen months after Penn National was notified of the lawsuit. The court noted that Penn National's insurance expert, Bernd Heinze, testified Penn National acted in bad faith in a different matter in 2007. The court found Heinze provided that in that case, $6 million "in punitive damages were awarded against Penn National . . . for purposes of punishing and deterring [it] and other insurers in the same position from acting in a similar fashion in the future." The court stated "Heinze sought to differentiate what appears to be similar conduct by Penn National in the instant case by relying on the insured tendering to Penn National in the 2007" case.

The trial court found punitive damages awards equal to the actual damages awarded for bad faith to Portrait Homes and the HOA, as the assignee of JJA's claims, were appropriate and not violative of due process.

The trial court entered a judgment for Portrait Homes in the following amounts:

| | |
|---|---|
| Breach of Contract-Duty to Defend | $42,791.24 |
| Breach of Contract-Duty to Indemnify | $2,500,000.00 |

| Prejudgment Interest | $807,693.50 |
| Attorney Fees/Costs | $250,003.26 |
| Bad Faith Refusal to Pay | $3,892,791.24 |
| Punitive Damages | $3,892,791.24 |
| **Total:** | **$11,386,070.48** |

The trial court entered a judgment for the HOA in the following amounts:

| Bad Faith Refusal to Pay | $5,370,147.29 |
| HOA's Judgment Creditor Claim | $5,213,170.40 |
| Punitive Damages | $5,370,147.29 |
| **Total:** | **$15,953,464.98** |

This appeal followed.

## STANDARD OF REVIEW

"Declaratory judgment actions are neither legal nor equitable, and therefore, the standard of review depends on the nature of the underlying issues." *Auto-Owners Ins. Co. v. Hamin*, 368 S.C. 536, 540, 629 S.E.2d 683, 685 (Ct. App. 2006). "When the purpose of the underlying dispute is to determine whether coverage exists under an insurance policy, the action is one at law." *Id.* Our supreme court has applied a legal standard of review to the determination of coverage under a CGL policy. *L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 366 S.C. 117, 120, 621 S.E.2d 33, 35 (2005).

"[A]n insurance policy is a contract between the insured and the insurance company[,] and the terms of the policy are to be construed according to contract law." *Auto Owners Ins. Co. v. Langford*, 330 S.C. 578, 581, 500 S.E.2d 496, 497 (Ct. App. 1998). "An action to construe a contract is an action at law . . . ." *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). Additionally, "[a]n action for breach of contract is an action at law." *Electro-Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter*, 357 S.C. 363, 367, 593 S.E.2d 170, 172 (Ct. App. 2004). Further, "a separate tort action [exists] for an insurer's bad-faith refusal to pay benefits under an insurance policy." *In re Mt. Hawley Ins. Co.*, 427 S.C. 159, 169, 829 S.E.2d 707, 713 (2019). "An action in tort for damages is an action at law." *Longshore v. Saber Sec. Servs., Inc.*, 365 S.C. 554, 560, 619 S.E.2d 5, 9 (Ct. App. 2005).

"In an action at law tried without a jury, an appellate court's scope of review extends merely to the correction of errors of law." *Temple v. Tec-Fab, Inc.*, 381 S.C. 597, 599-600, 675 S.E.2d 414, 415 (2009). "The [c]ourt will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings." *Id.* at 600, 675 S.E.2d at 415. "[T]he trial court's findings are equivalent to a jury's findings in a law action. Further, questions concerning credibility and the weight to be accorded evidence are exclusively for the trial court." *McCall v. IKON*, 380 S.C. 649, 658, 670 S.E.2d 695, 700 (Ct. App. 2008) (citation omitted). "We may not consider the case based on our view of the preponderance of the evidence, but must construe the evidence presented to the [trial court] so as to support [its] decision wherever reasonably possible." *Jordan v. Judy*, 413 S.C. 341, 348, 776 S.E.2d 96, 100 (Ct. App. 2015) (alterations by court) (quoting *Sheek v. Crimestoppers Alarm Sys.*, 297 S.C. 375, 377, 377 S.E.2d 132, 133 (Ct. App. 1989)). "We must look at the evidence in the light most favorable to the respondents and eliminate from consideration all evidence to the contrary." *Id.* (quoting *Sheek*, 297 S.C. at 377, 377 S.E.2d at 133).

## LAW/ANALYSIS

### I.  ISSUES AS TO THE HOA

#### A. Award of Coverage

Penn National argues the trial court improperly awarded coverage to Castillo and JJA Construction after Castillo advised Penn National he did not want a defense and refused to cooperate with Penn National. It contends Castillo's statement combined with his failure to communicate with Penn National was sufficient to terminate any duty it had to defend him. Penn National asserts that a policyholder may decline the benefits of his policy if he chooses, including a defense. It maintains Castillo's refusal operated as a knowing and voluntary relinquishment of his rights under the policy that was fully viable under the law. We disagree.

"Insurance policies are subject to the general rules of contract construction. The court must give policy language its plain, ordinary, and popular meaning." *S.C. Farm Bureau Mut. Ins. Co. v. Dawsey*, 371 S.C. 353, 356, 638 S.E.2d 103, 104 (Ct. App. 2006) (citation omitted). "Although exclusions in a policy are construed against the insurer, insurers have the right to limit their liability and to impose conditions on their obligations provided they are not in contravention of public policy or a statutory prohibition." *Id.* "The court cannot torture the meaning of

policy language to extend coverage not intended by the parties." *Id.* at 356, 638 S.E.2d at 105.

"Questions of coverage and the duty of a liability insurance company to defend a claim brought against its insured are determined by the allegations of the complaint. If the underlying complaint creates a possibility of coverage under an insurance policy, the insurer is obligated to defend." *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 382 S.C. 535, 543, 677 S.E.2d 574, 578 (2009) (citation omitted). "An insurer's duty to defend is separate and distinct from its obligation to pay a judgment rendered against an insured. However, these duties are interrelated." *Id.* at 544, 677 S.E.2d at 578 (citation omitted). "If the facts alleged in a complaint against an insured fail to bring a claim within policy coverage, an insurer has no duty to defend. Accordingly, the allegations of the complaint determine the insurer's duty to defend." *Id.* (citation omitted).

"Although the cases addressing an insurer's duty to defend generally limit this duty to whether the allegations in a complaint are sufficient to bring the claims within the coverage of an insurance policy, an insurer's duty to defend is not strictly controlled by the allegations in the complaint." *Id.* (quoting *USAA Prop. & Cas. Ins. Co. v. Clegg*, 377 S.C. 643, 657, 661 S.E.2d 791, 798 (2008)). "Instead, the duty to defend may also be determined by facts outside of the complaint that are known by the insurer." *Id.* (quoting *Clegg*, 377 S.C. at 657, 661 S.E.2d at 798).

"If the facts alleged in the . . . complaint fail to bring a claim within policy coverage, [the insurance company] has no duty to defend." *Prior v. S.C. Med. Malpractice Liab. Ins. Joint Underwriting Ass'n*, 305 S.C. 247, 249, 407 S.E.2d 655, 657 (Ct. App. 1991) (per curiam). "In examining the complaint, we must look beyond the labels describing the acts, to the acts themselves which form the basis of the claim against the insurer." *Id.* Our supreme court has found that "[d]espite the use of the terms 'negligence' and 'recklessness[]' [in the complaint,] the allegations charged the commission of an intentional tort only." *S.C. Med. Malpractice Liab. Ins. Joint Underwriting Ass'n v. Ferry*, 291 S.C. 460, 462, 354 S.E.2d 378, 379-80 (1987).

"The defense of such suits by the insurer is a valuable right of the insured for which he pays and to which he is entitled by the very words of the policy." *Nationwide Mut. Ins. Co. v. Simmonds*, 315 S.C. 404, 407, 434 S.E.2d 277, 278 (1993) (quoting *Am. Cas. Co. v. Howard*, 187 F.2d 322, 327 (4th Cir. 1951)). Our supreme court has "accord[ed] with those jurisdictions which distinguish an insurer's obligation to provide a defense to its insured with its duty to provide

coverage." *Id.* In *Allstate Insurance Co. v. Wilson*, our supreme court determined the insurer's "obligation to defend existed from the time the actions were instituted and continued until it fulfilled its obligation under its policy, all of which was done under a reservation of rights, notice of which had been given." 259 S.C. 586, 592, 193 S.E.2d 527, 530 (1972).

In the present case, evidence supports the trial court's finding Castillo did not decline coverage. Castillo's interaction with McLeod during the cold call in his garage did not amount to him declining coverage as Penn National contends; Castillo had a limited amount of information at the time of that interaction. Accordingly, we affirm the trial court's award of coverage to Castillo and JJA.

## B. Policies' Notice and Cooperation Conditions and Prejudice

Penn National argues the trial court improperly failed to conclude Castillo violated the notice and cooperation conditions contained in the policies as a matter of law. It further argues because Castillo's violations of those conditions led to entry of default and default judgment, the trial court erred in failing to find it suffered substantial prejudice as a result. It asserts the trial court incorrectly found the rule that entry of a default judgment against an insured substantially prejudices an insurer applied only when the insurer had no notice of the suit before default was entered. It contends *Merit Insurance Co.*[19] stands for the opposite proposition. It asserts that in that case, the insurer had notice of the claim and legal proceedings against the insured and was conducting settlement negotiations on the insured's behalf. It maintains that in that case, the insured failed to forward copies of the pleadings to the carrier, and the court found that entry of default against the insured constituted substantial prejudice as a matter of law, even though the insurer was aware of the suit.

Penn National also asserts it could not have unilaterally appointed counsel on Castillo's behalf, avoiding entry of default, without his approval. It contends the South Carolina Rules of Professional Conduct provide that a prospective client must approve counsel before that attorney can act on the client's behalf and courts have interpreted that rule as applicable in the insurer-appointed-counsel context. It argues its inability to retain counsel on Castillo's behalf is not a ground upon which it sought to deny coverage but the inability to hire counsel is the manner in which it was prejudiced by Castillo's failure to tender the claim or cooperate, grounds specifically mentioned in the ROR letter sent to Castillo following his refusal to

---

[19] *Merit Ins. Co. v. Koza*, 274 S.C. 362, 264 S.E.2d 146 (1980).

cooperate with McLeod and in its denial of Castillo's claim. It asserts the trial court found consent existed by virtue of the insuring agreement and duty to defend. Penn National contends authorities such as *Twin City*[20] and *Eastwood Construction*[21] contradict that conclusion and hold the insured must consent to counsel appointed by the carrier. It maintains the trial court erred in relying on an ethics advisory opinion released eight years after the events in question and after this issue was raised by Penn National in this litigation for the proposition that an attorney could enter an appearance on behalf of the insured without the insured's consent to the representation. It contends the advisory opinion conflicts with the governing authority of *Twin City* and *Eastwood Construction*. It also asserts the advisory opinion requires the insured be missing for the insurer to proceed without consent, but Castillo's location was not in dispute. We disagree with Penn National's arguments as to prejudice. Accordingly, we need not address whether the trial court erred in failing to find Castillo violated the notice and cooperation clauses.

"Nearly every insurance policy contains a provision requiring the insured to timely notify its insurer when a lawsuit is filed against the insured." *Neumayer v. Phila. Indem. Ins. Co.*, 427 S.C. 261, 266, 831 S.E.2d 406, 408 (2019). "Common sense dictates that the insurer must have notice of a claim or lawsuit in order to properly investigate and defend against it, and these clauses ensure that the insurer receives notice by imposing this obligation on the insured." *Id.* Recognizing the potential inequities in permitting an insurer to avoid coverage to an innocent third party merely because the at-fault party—the insured—did not inform its insurer of a lawsuit, South Carolina "judicially adopted a notice-prejudice rule, whereby the insurer had the burden to show that it was substantially prejudiced by the failure of its insured to comply with the notice and cooperation provisions." *Id.* "This rule prevented an insurer from relying on an immaterial breach by its own insured as a defense to paying an injured third party." *Id.* at 267, 831 S.E.2d at 409.

"[A]n insurer's duty to defend is triggered when the underlying claim is brought and thus 'pre-exists any obligation on the part of the insured as to notice or compliance with the voluntary payment provision of an insurance contract.'" *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 53 F. Supp. 3d 816, 828

---

[20] *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365 (4th Cir. 2005).
[21] *State Nat'l Ins. Co. v. Eastwood Constr. LLC*, No. 6:16-cv-02607-AMQ, 2018 WL 8787543 (D.S.C. Sept. 5, 2018).

(D.S.C. 2014) (quoting *Liberty Mut. Ins. Co. v. Black & Decker Corp.*, 383 F. Supp. 2d 200, 205 (D. Mass. 2004)).

"[A]n insurer, seeking to relieve itself of liability because of the violation by the insured of a cooperation clause in the policy, has the burden of showing not only that the insured failed to cooperate within the meaning of the policy provision but that it was substantially prejudiced thereby." *Vaught v. Nationwide Mut. Ins. Co.*, 250 S.C. 65, 71, 156 S.E.2d 627, 630 (1967). "Such issue is generally one of fact . . . ." *Id.*

"[A] liability insurer may successfully defend upon the ground that the insured has violated the cooperation clause of the policy only when the breach has been material and has resulted in substantial prejudice to the insurer." *Twin City Fire Ins. Co.*, 433 F.3d at 374-75 (quoting *Evans v. Am. Home Assurance Co.*, 252 S.C. 417, 420, 166 S.E.2d 811, 813 (1969)). "In *Evans*, the insured allegedly refused to participate in his defense, as conducted by an attorney that his insurance company retained." *Twin City Fire Ins. Co.*, 433 F.3d at 375. "[T]he insured's failure to cooperate in *Evans* was ambiguous and the court held that the insurance company had not met its burden of proving that he had refused to cooperate." *Id.*

An insurer can raise as a defense against actions brought by injured third parties an insured's failure to comply with policy provisions if the insurer has been substantially prejudiced by the insured's noncompliance. *Merit Ins. Co.*, 274 S.C. at 364, 264 S.E.2d at 147. "Whe[n] the rights of innocent parties are jeopardized by a failure of the insured to comply with the notice requirements of an insurance policy, the insurer must show substantial prejudice to the insurer's rights." *Vt. Mut. Ins. Co. v. Singleton ex rel. Singleton*, 316 S.C. 5, 12, 446 S.E.2d 417, 421 (1994). "The burden of proof is upon the insurer to show not only that the insured has failed to perform the terms and conditions invoked upon him by the policy contract but in addition that it was substantially prejudiced thereby." *Squires v. Nat'l Grange Mut. Ins. Co.*, 247 S.C. 58, 67, 145 S.E.2d 673, 677 (1965).

"The driving force behind the notice-prejudice rule is that there is 'no sound reason . . . to permit a mere technical noncompliance to deprive an innocent third party of benefits to which he would otherwise be entitled.'" *Neumayer*, 427 S.C. at 272, 831 S.E.2d at 411 (quoting *Factory Mut. Liab. Ins. Co. of Am. v. Kennedy*, 256 S.C. 376, 381, 182 S.E.2d 727, 729 (1971)). "Rather than provide a 'technical escape-hatch' for the insurer to deny coverage, the notice-prejudice rule balances both interests without a wholesale prohibition of these clauses." *Id.*

In *Merit Ins. Co.*, the court found "prejudice is clearly established by the fact that a default judgment was entered against the insured." 274 S.C. at 364, 264 S.E.2d at 147. In that case, "the suit papers in question were never forwarded to [the insurer]. However, the evidence [wa]s in direct conflict as to whether [the insurer] was notified that the papers had actually been served." *Id.* at 364-65, 264 S.E.2d at 147.

In *Tucker v. State Farm Mutual Automobile Insurance Co.*, 232 S.C. 615, 623, 103 S.E.2d 272, 277 (1958), the supreme court had no doubt the insured's failure to cooperate prejudiced the insurer in that case. The supreme court noted the trial court correctly found the insurer "attempted to get [the insured] to come in. . . . [The insurer] wrote him several letters, and there is no denial that he got the letters, but he refused to answer them." *Id.* at 624, 103 S.E.2d at 277. "[The insured] didn't show any cooperation at all and wouldn't show any unless he could be assured that the hospital bills would be paid." *Id.* "That's why he was refusing to sign anything . . ." *Id.* The trial court did not find "any conflict in the evidence . . . to go to the jury, to show whether he did not cooperate." *Id.* The supreme court recognized in addition to the trial court's findings, the insured repeatedly told the attorney the insurer provided him that he "had decided to have nothing to do with the action for damages against him; and he did not, which resulted in default judgment." *Id.*

"Although South Carolina appellate courts have never held the entry of default alone clearly establishes prejudice, the South Carolina Supreme Court has offered guidance on how prejudice to an insurer can arise through the entry of default." *Founders Ins. Co. v. Richard Ruth's Bar & Grill LLC*, 761 F. App'x 178, 183 (4th Cir. 2019) (citing *Hatchett v. Nationwide Mut. Ins. Co.*, 244 S.C. 425, 434, 137 S.E.2d 608, 612-13 (1964)). In *Hatchett*, an insured brought suit against an uninsured motorist. 244 S.C. at 428, 137 S.E.2d at 609. The insured did not notify its insurer of the suit until the uninsured motorist was in default. *Id.* at 434, 137 S.E.2d at 613. The South Carolina Supreme Court noted the insured had made no effort to establish a reason for his "failure to comply with the terms of the contract" requiring him to give notice "as soon as practicable." *Id.* at 434, 137 S.E.2d at 612-13. The court found the insurer had the right to provide a defense to the uninsured motorist but the insured "refused to waive the default and permit an answer to be filed" by the insurer. *Id.* at 432-34, 137 S.E.2d at 612-13. Instead, the insured "chose to rest his position upon the rights he had acquired through default which operated to the prejudice of the" insurer. *Id.* at 434, 137 S.E.2d at 613. The court found the insurer was "deprived of the opportunity . . . to investigate promptly, to negotiate a settlement without the handicap of a default

position, or to" provide a defense, to make certain the insured recovered a fairly established amount. *Id.*

"In *Episcopal Church* . . . [a South Carolina district court] examined whether, under South Carolina law, an insured has the right to select counsel for its insured based on [certain] language . . ." *Eastwood Constr. LLC*, 2018 WL 8787543, at *10. "[T]he insurance policy examined in *Episcopal Church* did not specifically state that the insurer has the right to select counsel. However, the policy stated that the insurer has '"the right and duty to defend a lawsuit seeking damages which may be covered under the Commercial Liability Coverage."'" *Id.* (citation omitted) (quoting *Episcopal Church*, 53 F. Supp. 3d at 823). The district court recognized "South Carolina courts have found that where a policy provides an insurer with the right and duty to defend, the insurer has 'the right and the duty *to control the defense* until such time as it [i]s determined that it ha[s] no liability insurance coverage.'" *Episcopal Church*, 53 F. Supp. 3d at 823 (emphasis added by court) (alterations by court) (quoting *Allstate Ins. Co. v. Wilson*, 259 S.C. 586, 592, 193 S.E.2d 527, 530 (1972)). The district court found the policy language provided the insurer "the right to defend [the insured], and . . . under established South Carolina law, that right includes the right to control the defense and select defense counsel." *Id.*

In *Eastwood Construction*, "the . . . [p]olicies confer[red] upon [the insurer] 'the right and duty to defend the insured against any "suit" seeking damages.'" *Eastwood Constr. LLC*, 2018 WL 8787543, at *11. The district court determined, "Based upon prevailing South Carolina law, this language gives [the insurer] the right to select counsel. . . . [The insurer] has the right to select counsel to defend [the insured] in the . . . lawsuit . . . ." *Id.* (citing *Episcopal Church*, 53 F. Supp. 3d at 823).

Even though the insurer may have a duty to defend, "an insured must consent to the counsel assigned by the insurance company." *Twin City Fire Ins. Co.*, 433 F.3d at 374. The South Carolina Rules of Professional Conduct state, "A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent . . . ." Rule 1.8(f), RPC, Rule 407, SCACR. In *Twin City Fire Insurance Co.*, the Fourth Circuit Court of Appeals determined that "[i]f the insured does not consent to counsel selected by the insurance company, the insured may refuse the defense and pay for its own defense. Stated differently, 'having refused the contractual terms of the policy, the insured foregoes its right to compensation for defense fees.'" 433 F.3d at 374 (quoting *Finley v. Home Ins. Co.*, 975 P.2d 1145, 1155 (Haw. 1998)).

This court has previously found instructive an ethics advisory opinion directly addressing an issue before the court, while recognizing the advisory opinion was not binding on this court. *Brooks v. S.C. Comm'n on Indigent Def.*, 419 S.C. 319, 330 n.3, 797 S.E.2d 402, 408 n.3 (Ct. App. 2017). In the Ethics Advisory Opinion cited by the trial court, the insurance carrier had retained an attorney to defend the insured in a lawsuit alleging negligent construction of a condominium project. S.C. Bar Ethics Advisory Comm., Ethics Advisory Op. 19-04, 2019 WL 5853809, at *1 (2019). The "[p]laintiff's counsel could not locate the [i]nsured," and the "[i]nsured was served by publication." *Id.* "Despite repeated attempts, neither [the i]nsurance [c]arrier nor [the a]ttorney c[ould] locate [the i]nsured regarding the pending lawsuit." *Id.*

The opinion determined the attorney could appear on behalf of and defend the insured at the insurance carrier's request if the carrier's contract with the insured gave it the right to retain counsel to defend claims made against the insured. *Id.* The opinion explained that when by contract, including insurance contracts, a person "delegate[s] authority to another to choose counsel [and] conduct the defense of a claim, . . . an attorney may reasonably rely upon the instruction of the person's agent, in this situation [the i]nsurance [c]arrier, to appear and conduct the defense of the case in the absence of any" contrary instructions by the missing insured. *Id.* at *2 (footnote omitted). The opinion concluded the "[i]nsured's contracting with [the i]nsurance [c]arrier through the insurance policy for a defense constitutes consent (in the absence of any further communications from the [i]nsured to the contrary) for [the a]ttorney to receive compensation from [the] insurance [c]arrier for undertaking defense for [the i]nsured subject to [Rule] 1.8(f)." *Id.*

Here, Castillo did not notify Penn National of the lawsuit. However, in addition to showing Castillo did not provide it with notice, Penn National must also show prejudice because this case involves an innocent third party. Penn National clearly received notice of the suit despite Castillo's failure to notify it. The trial court did not err in finding Penn National was not substantially prejudiced by Castillo's failure to notify it of the lawsuit. Because Penn National knew of the lawsuit well before Castillo, it was not prejudiced by Castillo's failure to forward the paperwork or contact it. Penn National had the opportunity to respond to the suit; it even filed a motion for an extension to file an answer. It did not make any attempt to investigate. Penn National had defended Castillo in similar suits in the past. Based on its own knowledge of the suit, Penn National had opportunities, of which it did not take advantage, to at least attempt to protect itself. Accordingly, the trial

court did not err in finding Penn National was not substantially prejudiced due to lack of notice by Castillo.

Additionally, Penn National has not shown it was prejudiced by Castillo's alleged lack of cooperation. While it asserts it was prejudiced because it was ethically unable to appoint counsel here without Castillo's express permission, we note that both *Twin City* and *Eastwood Construction* are federal court opinions. Accordingly, the trial court is not bound by them. *See Laffitte v. Bridgestone Corp.*, 381 S.C. 460, 473 n.9, 674 S.E.2d 154, 162 n.9 (2009) ("[A] federal court decision interpreting state law is not binding on this [c]ourt."). Further, the trial court found the facts in those cases were distinguishable from those here. Here, the record contains no evidence of Penn National attempting to assign counsel to Castillo. Therefore, the cases in which the insurer attempted to assign counsel to the insured do not decide this case. Additionally, the ethics opinion relied upon by the trial court, while not controlling, is instructive and persuasive authority, and it did not serve as the only basis for the court's decision. Moreover, as Penn National never attempted to hire an attorney for Castillo, we are unpersuaded by its assertion it was prejudiced because it could not ethically do so.

Based on our finding Penn National has not shown it was prejudiced, we do not need to address its arguments on Castillo's failure to notify or failure to cooperate. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address an issue when other issues are dispositive of the matter).

## C. HOA's Claim for Indemnification as a Judgment Creditor

Penn National argues the HOA's claim for indemnification as a judgment creditor of the insureds fails because the insureds are not entitled to coverage. Penn National asserts the HOA, as a judgment creditor of the Castillo entities' rights under the policies, stands in the shoes of Castillo and JJA Construction in seeking coverage under the policies and is only entitled to satisfy its award or judgment to the extent the insureds would be entitled to coverage. It contends the HOA is not entitled to coverage because Penn National appropriately denied coverage. It asserts the Castillo entities are not entitled to coverage under the policies because they breached the conditions for coverage under the policies by failing to tender the Persimmon Hill litigation to Penn National or to cooperate with Penn National in its investigation and defense of such litigation. We disagree.

"[A]n injured party who brings suit against a liability carrier in order to collect on a judgment previously acquired against an insured is possessed of all rights of the insured and subject to all defenses that exist as between the insured and the insurance carrier." *Lee v. Gulf Ins. Co.*, 248 S.C. 296, 298, 149 S.E.2d 639, 640-41 (1966). "[T]he injured person[] has no greater right under the liability insurance policy than has the insured or his estate." *Crook v. State Farm Mut. Auto. Ins. Co.*, 235 S.C. 452, 460, 112 S.E.2d 241, 245 (1960). When the insurer never afforded any coverage to the insured, the "judgment creditors [could not recover because they] have no greater rights under the binder herein involved than" the insured. *S. Farm Bureau Cas. Ins. Co. v. Ausborn*, 249 S.C. 627, 648, 155 S.E.2d 902, 913 (1967).

Penn National's argument relies on the premise that JJA was not entitled to coverage because he declined that coverage. As described above, JJA was entitled to coverage, and the trial court did not err in relation to this argument. Accordingly, we affirm as to this issue.

### D. Bad Faith Claim

Penn National argues the trial court's findings were insufficient to satisfy the legal standards for a bad faith claim. It asserts its "Failure to Conduct an Investigation" was not unreasonable conduct as a matter of law. It maintains mailing ROR letters to an incorrect address cannot sustain a bad faith claim because that act did not "Result In" a denial of benefits. It further argues that asking Castillo whether he wanted a defense was a reasonable behavior as a matter of law. Additionally, it asserts no competent evidence supports the trial court's finding Penn National "Violated its Own Policies and Procedures." Moreover, it contends its references to denying the claim in its claim notes did not "Result In" the denial of the claim. Finally, it maintains the trial court's finding Penn National requested an extension of Castillo and JJA Construction's answer deadline without intention to respond is unsupported by the evidence and cannot support the bad faith claim. It maintains competent evidence does not support the trial court's conclusion it "violated its own policies and procedures" because no evidence of its policies and procedures was authenticated or admitted at trial. It contends this finding is based upon the trial court's conclusion it violated its "claims manual" by failing to take Castillo's recorded statement during McLeod's meeting with him. Penn National contends this finding of fact is completely unsupported by evidence in the record, as no "claims manual" was ever introduced as evidence. We disagree.

"In this jurisdiction it has long been recognized that insurance is a business affected with a public interest." *In re Mt. Hawley Ins. Co.*, 427 S.C. 159, 169, 829 S.E.2d 707, 713 (2019) (quoting *Hinds v. United Ins. Co. of Am.*, 248 S.C. 285, 291, 149 S.E.2d 771, 774-75 (1966)). "In furtherance of this policy, [our supreme c]ourt has recognized, in addition to a breach of contract action, a separate tort action for an insurer's bad-faith refusal to pay benefits under an insurance policy, whether for a first-party claim or a third-party claim." *Id.*; *see also Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc.*, 554 F. App'x 176, 186 (4th Cir. 2014) ("South Carolina recognizes a common law tort action for an insurer's bad faith in exercising duties owed to policyholders.").

"Bad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim." *Am. Fire & Cas. Co. v. Johnson*, 332 S.C. 307, 311, 504 S.E.2d 356, 358 (Ct. App. 1998).

> Bad faith refusal to pay first party benefits under a contract of insurance includes: (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Howard v. State Farm Mut. Auto. Ins. Co.*, 316 S.C. 445, 451, 450 S.E.2d 582, 586 (1994). "Whether an insurance company is liable for bad faith must be judged by the evidence before it at the time it denied the claim or if the insurance company did not specifically deny the claim by the evidence it had before it at the time the suit was filed." *Id.* at 448, 450 S.E.2d at 584. "An insured may recover damages for a bad faith denial of coverage if he or she proves there was no reasonable basis to support the insurer's decision to deny benefits under a mutually binding insurance contract." *Cock-N-Bull Steak House, Inc. v. Generali Ins. Co.*, 321 S.C. 1, 6, 466 S.E.2d 727, 730 (1996) (quoting *Dowling v. Home Buyers Warranty Corp.*, 303 S.C. 295, 297, 400 S.E.2d 143, 144 (1991)).

An insurer acts in bad faith when no reasonable basis supports the insurer's decision to contest a claim. *BMW of N. Am., LLC v. Complete Auto Recon Servs., Inc.*, 399 S.C. 444, 453, 731 S.E.2d 902, 907 (Ct. App. 2012). "However, whe[n] an insurer has a reasonable ground for contesting a claim, there is no bad faith." *Id.* "Additionally, this good faith obligation includes an insurer's duty to

investigate a claim." *Id.* "Importantly, an insured need not prove a breach of an express contractual provision as a prerequisite to bringing a bad faith cause of action." *Id.* "An insurer is not insulated from liability for bad faith merely because there is no clear precedent resolving a coverage issue raised under the particular facts of the case." *Mixson, Inc. v. Am. Loyalty Ins. Co.*, 349 S.C. 394, 400, 562 S.E.2d 659, 662 (Ct. App. 2002).

"[I]f an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action. Actual damages are not limited by the contract." *Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 340, 306 S.E.2d 616, 619 (1983).

The record contains evidence to support the trial court's finding of bad faith. Some of the instances of bad faith the trial court found were Penn National's failure to investigate; its failure to check its own records for Castillo's contact information; its knowledge Castillo never received any of its RORs; its application of terms not in the policy (requiring Castillo to request a defense); and its not informing Castillo of all of the pertinent information known to it about the claim. The trial court did not err in finding Penn National acted in bad faith. Accordingly, we affirm the award of damages for the bad faith cause of action to the HOA.

### E. Punitive Damages

Penn National argues the trial court's findings of fact do not support a punitive damages award. It asserts the bad faith conduct identified by the trial court, even if taken as true, does not rise to the level of willfulness or reckless disregard of Castillo's and JJA Construction's rights sufficient to merit an award of punitive damages. It contends its election not to retain experts, interview witnesses, or conduct a recorded statement with Castillo about the merits of the case was a reaction to Castillo's silence with regard to the claim and ultimately, to his declination of a defense. Penn National further contends no evidence in the record supports the finding that its asking Castillo whether he wanted its assistance in the matter was done in knowing contravention of his policy rights. It maintains the record shows it affirmatively sought Castillo's response on that issue following his failure to contact it for more than six months after receiving the suit papers. It argues no evidence in the record shows it deliberately mailed its ROR letters to an incorrect address; it asserts Gross admitted he made a mistake in addressing the letter to only one of the two addresses on file for Castillo but did not admit to any deliberate or conscious decision to improperly mail the letter to an old address.

Penn National maintains that prospectively asking Castillo whether he wanted a defense was reasonable as a matter of law given that the question followed months of silence following his failure to contact it for months after being notified of the lawsuit pending against him and his corporation. Additionally, Penn National asserts that all letters were copied to Castillo's agent, which suggests there was no willing or reckless attempt to have Castillo waive any benefits due under the policy. We disagree.

"An award of punitive damages is left almost entirely to the discretion of the jury and trial judge." *Jordan v. Holt*, 362 S.C. 201, 207, 608 S.E.2d 129, 132 (2005). The basis for allowing the trial court this discretion is because it "heard the evidence and was more familiar than we with the evidentiary atmosphere at trial," which gives it a more informed view than an appellate court. *Id.* (quoting *Lucht v. Youngblood*, 266 S.C. 127, 138, 221 S.E.2d 854, 860 (1976)). In reviewing a damages award, we do not weigh the evidence, but determine if any evidence supports the award. *Austin v. Specialty Transp. Servs., Inc.*, 358 S.C. 298, 311, 594 S.E.2d 867, 873 (Ct. App. 2004). "This [c]ourt must affirm the trial court's punitive damages finding for the Respondents if any evidence reasonably supports the [trial court's] factual findings." *Id.* at 314, 594 S.E.2d at 875. This court "must affirm the trial court's finding of punitive damages if any evidence reasonably supports the [trial court's] factual findings." *Jordan*, 362 S.C. at 207, 608 S.E.2d at 132.

In *Jordan*, the trial court awarded a party punitive damages on one of its claims following a bench trial. *Id.* at 204, 608 S.E.2d at 130. The supreme court found because the trial court awarded punitive damages on a cause of action that was an action at law, the case was one at law and the trial court's findings would be upheld on appeal unless no evidence supported the findings. *Id.* at 205, 608 S.E.2d at 131. The supreme court reversed the court of appeals in that case because it "improperly assessed the facts of th[e] case based on its own view of the evidence instead of determining whether the trial court's findings lacked evidentiary support." *Id.*

"If the[] elements [of a cause of action for bad faith] are pleaded and proved, the insured's remedy is not limited to the face amount of the contract." *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 360, 415 S.E.2d 393, 397 (1992). "[I]f [an insured] can demonstrate the insurer's actions were willful or in reckless disregard of the insured's rights [in a bad faith action], he can recover punitive damages." *Nichols*, 279 S.C. at 340, 306 S.E.2d at 619.

"The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future" as well as "to vindicate a private right of the injured party by requiring the wrongdoer to pay money to the injured party." *Clark v. Cantrell*, 339 S.C. 369, 378-79, 529 S.E.2d 528, 533 (2000). "At least three important purposes are served by a punitive damages award: (1) punishment of the defendant's reckless, willful, wanton, or malicious conduct; (2) deterrence of similar future conduct by the defendant or others; and (3) compensation for the reckless or willful invasion of the plaintiff's private rights." *Mellen v. Lane*, 377 S.C. 261, 290, 659 S.E.2d 236, 251 (Ct. App. 2008). "The paramount purpose for awarding punitive damages is not to compensate the plaintiff but to punish and set an example for others." *Id.*

To receive a punitive damages award, "the plaintiff has the burden of proving by clear and convincing evidence the defendant's misconduct was willful, wanton, or in reckless disregard of the plaintiff's rights." *Welch v. Epstein*, 342 S.C. 279, 301, 536 S.E.2d 408, 419 (Ct. App. 2000). "A tort is characterized as reckless, willful[,] or wanton if it was committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights." *Taylor v. Medenica*, 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996). "A conscious failure to exercise due care constitutes willfulness." *McCourt ex rel. McCourt v. Abernathy*, 318 S.C. 301, 308, 457 S.E.2d 603, 607 (1995).

The trial court did not err in finding Penn National's behavior warranted the imposition of punitive damages in favor of the HOA. The trial court found that Penn National took a position unsupported by the policies or law that Castillo had to request a defense before it would provide one to him, despite the fact that his policies and his payments entitled him to one. In the previous section, we affirmed the trial court's finding of bad faith. Based on that finding, the award of punitive damages was justified. Additionally, it appears from Heinze's testimony Penn National has engaged in similar behavior before. Accordingly, we affirm the award of punitive damages to the HOA.

## II. ISSUES AS TO PORTRAIT HOMES

### A. Award of Coverage

Penn National argues the trial court improperly awarded coverage to Portrait Homes as an additional insured. First, Penn National asserts the trial court

improperly considered parol evidence to interpret unambiguous language in the Penn National policies. Alternatively, Penn National contends the documents in its underwriting file do not establish Castillo intended to remain a named insured after he formed JJA Construction, Inc. Penn National also maintains Portrait Homes did not have a contract with JJA Construction, Inc. even if JJA Construction, Inc. did business as JJA Framing. Additionally, Penn National argues the trial court improperly relied on certificates of insurance to find Portrait Homes qualified as an additional insured. Finally, Penn National posits the trial court incorrectly found the Master Agreement governed JJA's Work at Persimmon Hill.[22] We disagree.

---

[22] In Penn National's 59(e), SCRCP, motion, it argued the trial court "improperly look[ed] beyond the plain terms of the policies and Castillo's contract with . . . Portrait Homes . . . to ascertain the parties' 'intentions' where the contractual terms are unambiguous." Penn National's motion asserted "the court's finding that Portrait Homes is an additional insured under either of the additional insured endorsements . . . is improperly premised on evidence beyond the contracts." The only issue Penn National raised with the consideration of the other evidence was the trial court should not have considered it because the contracts were not ambiguous. "[A]n appellate court cannot address an issue unless it was raised to, and ruled upon by, the trial court." *Smith v. Phillips*, 318 S.C. 453, 455, 458 S.E.2d 427, 429 (1995) (per curiam). The transcript from the posttrial hearing—along with much of the transcript from trial—was not included in the record on appeal. However, the trial court's posttrial order referenced the argument the Master Agreement should not be considered because it was signed after the Housing and Purchase Order Contracts and expressly rejected the argument. Thus, Penn National presumably raised this argument to the trial court to some extent, and the trial court did in fact rule on it.

Accordingly, we will err on the side of caution and address the argument as to the timing of the signing of the Master Agreement because the trial court had the opportunity to consider it and actually ruled on it. *See Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 372-73, 628 S.E.2d 902, 919 (Ct. App. 2006) ("Error preservation principles are intended to enable the trial court to rule after it has considered all relevant facts, law, and arguments. The rationale for the rule is that until the trial court considers the matter and makes a ruling, an appellate court is unable to find error." (citation omitted)); *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) ("Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for

"In construing or interpreting a contract, 'it is axiomatic that the main concern of the court is to ascertain and give effect to the intention of the parties.'" *Bluffton Towne Ctr., LLC v. Gilleland-Prince*, 412 S.C. 554, 570, 772 S.E.2d 882, 891 (Ct. App. 2015) (quoting *Progressive Max Ins. Co. v. Floating Caps, Inc.*, 405 S.C. 35, 46, 747 S.E.2d 178, 184 (2013)). "If [a contract's] language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and the contract's language determines the instrument's force and effect." *Id.* (quoting *Progressive Max Ins. Co.*, 405 S.C. at 46, 747 S.E.2d at 184). "In construing and determining the effect of a written contract, the intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument . . . ." *Silver v. Aabstract Pools & Spas, Inc.*, 376 S.C. 585, 591, 658 S.E.2d 539, 542 (Ct. App. 2008) (quoting *McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 204, 33 S.E.2d 501, 509 (1945)). "If a contract is unambiguous, extrinsic evidence cannot be used to give the contract a meaning different from that indicated by its plain terms." *Watson v. Underwood*, 407 S.C. 443, 455, 756 S.E.2d 155, 161 (Ct. App. 2014) (quoting *Bates v. Lewis*, 311 S.C. 158, 161 n.1, 427 S.E.2d 907, 909 n.1 (Ct. App. 1993)). "Whe[n] the language of a contract is plain and capable of legal construction, that language alone determines the instrument's force and effect." *Id.* (alteration by court) (quoting *Jordan v. Sec. Grp., Inc.*, 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993)).

"Under the parol evidence rule, extrinsic evidence is inadmissible to vary or contradict the terms of a contract. 'However, if a contract is ambiguous, parol evidence is admissible to ascertain the true meaning and intent of the parties.'" *HK*

---

meaningful appellate review." (quoting *Queen's Grant II Horizontal Prop. Regime*, 368 S.C. at 373, 628 S.E.2d at 919)).

However, Penn National did not raise in its 59(e) motion the argument that the certificate of insurance's limiting language rendered it inappropriate to consider and the record does not contain any argument by Penn National to that affect. Therefore, we find this argument unpreserved and do not address it. *See Palmetto Wildlife Extractors, LLC v. Ludy*, 435 S.C. 690, 705, 869 S.E.2d 859, 867 (Ct. App. 2022) ("When a party receives an order that grants certain relief not previously contemplated or presented to the trial court, the aggrieved party must move, pursuant to Rule 59(e), SCRCP, to alter or amend the judgment in order to preserve the issue for appeal." (alteration omitted) (quoting *In re Timmerman*, 331 S.C. 455, 460, 502 S.E.2d 920, 922 (Ct. App. 1998))).

*New Plan Exch. Prop. Owner I, LLC v. Coker*, 375 S.C. 18, 23-24, 649 S.E.2d 181, 184 (Ct. App. 2007) (citation omitted) (quoting *Koontz v. Thomas*, 333 S.C. 702, 709, 511 S.E.2d 407, 411 (Ct. App. 1999)). "Resort to construction by a party is only done when the contract is ambiguous or there is doubt as to its intended meaning." *Watson*, 407 S.C. at 455, 756 S.E.2d at 161-62 (quoting *Jordan*, 311 S.C. at 230, 428 S.E.2d at 707).

"A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." *Id.* at 455, 756 S.E.2d at 161 (quoting *Jordan*, 311 S.C. at 230, 428 S.E.2d at 707). "A contract is ambiguous when the terms of the contract are reasonably susceptible to more than one interpretation. The uncertainty in interpretation can arise from the words of the instrument, or in the application of the words to the object they describe." *Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 242, 672 S.E.2d 799, 803 (Ct. App. 2009) (citations omitted). An ambiguous contract is one that "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who (1) has examined the context of the entire integrated agreement; and (2) is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Laser Supply & Servs., Inc. v. Orchard Park Assocs.*, 382 S.C. 326, 334, 676 S.E.2d 139, 144 (Ct. App. 2009).

Whether a contract's language is ambiguous is a question of law for the court. *Williams v. Gov't Emps. Ins. Co. (GEICO)*, 409 S.C. 586, 594, 762 S.E.2d 705, 710 (2014). "The *construction* of a clear and unambiguous contract is a question of law for the court to determine." *Id.* "If the court decides the language is ambiguous, however, evidence may be admitted to show the intent of the parties, and the determination of the parties' intent becomes a question of fact for the fact-finder."[23] *Id.*

---

[23] Portrait Homes refers to the alleged ambiguities as latent, as opposed to patent. "A patent ambiguity is one that arises upon the words of a will, deed, or contract. A latent ambiguity exists when there is no defect arising on the face of the instrument, but arising when attempting to apply the words of the instrument to the object or subject described." *Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 392 S.C. 506, 526, 709 S.E.2d 85, 95 (Ct. App. 2011) (citation omitted). This court has previously held the "[i]nterpretation of an unambiguous policy, or a policy with a patent ambiguity, is for the court," while the "[i]nterpretation of a policy with a latent ambiguity is for the jury." *Id.* at 526, 709 S.E.2d at 95-96. Portrait Homes acknowledges recent South Carolina jurisprudence has disregarded the distinction between the types of ambiguities and left the interpretation of both types to the

"Noncontradictory terms and conditions may be implied in a contract when the circumstances warrant it to effectuate the manifest intention of the parties." *S. Realty & Constr. Co. v. Bryan*, 290 S.C. 302, 311, 350 S.E.2d 194, 199 (Ct. App. 1986). "[T]he literal interpretation of policy language will be rejected where its application would lead to unreasonable results and the definitions as written would be so narrow as to make coverage merely 'illusory.'" *S.C. Farm Bureau Mut. Ins. Co. v. Kennedy*, 398 S.C. 604, 615, 730 S.E.2d 862, 867 (2012). "Court[s] will look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous or conflicting . . . ." *Bell v. Progressive Direct Ins. Co.*, 407 S.C. 565, 580, 757 S.E.2d 399, 407 (2014) (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927 (Del. 1982)).

"Common sense and good faith are the leading touchstones of construction of the provisions of a contract; where one construction makes the provisions unusual or extraordinary and another construction which is equally consistent with the language employed would make it reasonable, fair and just, the latter construction must prevail." *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). "In the construction of insurance contracts, it is vitally essential that the courts do not ignore the fact that the primary object of all insurance is to insure, and . . . such contracts must be liberally construed in favor of the insured." *Parker v. Jefferson Standard Life Ins. Co.*, 158 S.C. 394, 397, 155 S.E. 617, 618 (1930). "[A]n ambiguity must be resolved in favor of the insured and construed most strongly against the insurer." *Columbia Coll. v. Pa. Ins. Co.*, 250 S.C. 237, 253, 157 S.E.2d 416, 425 (1967). "The construction placed upon a contract by the parties themselves, if not determinative, is entitled to great weight." *Payne v. Duke Power Co.*, 304 S.C. 447, 451, 405 S.E.2d 399, 401 (1991). "Ambiguous language in a contract should be construed liberally and most strongly in favor of the party who did not write or prepare the contract and is not responsible for the ambiguity . . . ." *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 374 S.C. 483, 499-500, 649 S.E.2d 494, 502 (Ct. App. 2007) (quoting *Myrtle Beach Lumber Co. v. Willoughby*, 276 S.C. 3, 8,

---

jury. This court has explicitly recognized and applied this trend. *See Harbin v. Williams*, 429 S.C. 1, 8, 837 S.E.2d 491, 495 (Ct. App. 2019) ("Following our supreme court's recent trend . . . , we find the ambiguity . . . presented a question of fact, and the trial court did not err in submitting the ambiguity to the jury."). Because this case was resolved by bench trial, the trial court was responsible for interpreting any ambiguities and that interpretation was a question of fact.

274 S.E.2d 423, 426 (1981)). "[A]ny ambiguity in a contract, doubt, or uncertainty as to its meaning should be resolved against the party who prepared the contract or is responsible for the verbiage." *Id.* (quoting *Myrtle Beach Lumber Co.*, 276 S.C. at 8, 274 S.E.2d at 426).

"Under South Carolina law, two contracts executed at different times relating to the same subject matter, entered into by the same parties, are to be construed as one contract and considered as a whole." *Moshtaghi v. The Citadel*, 314 S.C. 316, 321, 443 S.E.2d 915, 918 (Ct. App. 1994). "[W]here the instruments have not been executed simultaneously but relate to the same subject matter and have been entered into by the same parties, the transaction comprising the contract will be considered as a whole." *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 268 S.C. 80, 88, 232 S.E.2d 20, 24 (1977). "This is true even though the transaction consumed more than one day; the date of the writings constituting such transaction is immaterial." *Id.*

"A contract is good between the parties, no matter how incorrect the names used in the paper may be, if it appears they were intended as the names of the parties to be bound by the contract or to receive its benefits." *Cobb & Seal Shoe Store v. Aetna Ins. Co.*, 78 S.C. 388, 389, 58 S.E.2d 1099, 1099 (1907). "A corporation, as well as individuals, may have or be known by several names in the transaction of its general business so that it may enforce, as well as be bound by, contracts entered into in an adopted name other than the regular name under which it was incorporated." *Long v. Carolina Baking Co.*, 190 S.C. 367, 377, 3 S.E.2d 46, 50 (1939). "If a corporation has acquired a name by usage, an adjudication against it by the name so acquired is valid and binding." *Id.* (emphasis omitted).

First, whether the policies contained ambiguities was a question of law for the trial court. "In an action at law tried without a jury, an appellate court's scope of review extends merely to the correction of errors of law." *Temple v. Tec-Fab, Inc.*, 381 S.C. 597, 599-600, 675 S.E.2d 414, 415 (2009). "The [c]ourt will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings." *Id.* at 600, 675 S.E.2d at 415. The policies listed JJA Construction, Inc. as an individual and Jose Castillo d/b/a JJA's Framing's business address as the work location's address. Therefore, the trial court did not err in finding the contract ambiguous. Accordingly, the trial court was not bound to the four corners of the contracts and could look at extrinsic evidence to interpret the policies. Thus, the trial court did not err in considering parol evidence.

Regarding the three policies with Endorsement 71 11 45, the trial court did not err in finding Portrait Homes was entitled to coverage because Jose Castillo d/b/a JJA Framing qualified as a named insured under the policies. On March 2, 2005, Penn National received a two-page document requesting it to change the name on the policy to "JJA Construction, Inc." The trial court noted this document had answers filled in for the portion that stated "[n]ame change only" and remained blank for the portion that stated "[f]ormation of a new entity." Additionally, the trial court observed the only change between the policies after Penn National processed the request was JJA Construction, Inc. becoming the named insured; the policy number, form of business, business description, and premium basis all remained the same. Therefore, Penn National's underwriting file indicated Jose Castillo d/b/a JJA Framing was the same business as JJA Construction, Inc. Indeed, Castillo testified that was the case at trial.

The trial court also did not err in alternatively finding Portrait Homes was entitled to coverage under the policies with Endorsement 71 11 45 because the contracts between Portrait Homes and Jose Castillo d/b/a JJA Framing also bound JJA Construction, Inc. The trial court noted that the underlying lawsuits alleged both Castillo and JJA Construction, Inc. did business as JJA Framing. The trial court also cited several exhibits that showed Gross recognized the underlying lawsuits alleged both Castillo and JJA Construction, Inc. were doing business as JJA Framing and provided that information to Parsons. Additionally, Castillo testified that JJA Construction, Inc. did business as JJA Framing. Therefore, the requirement for a written contract with a named insured was satisfied because the contracts bound JJA Framing, and JJA Construction, Inc. did business as JJA Framing.

Regarding the two policies with Endorsement CG 20 37, the trial court did not err by concluding the parties intended the policies to cover all work JJA Framing did for Portrait Homes and implying that term into the contract. The policies had latent ambiguities because they listed the work location as JJA Framing's business address instead of the construction site. The trial court considered the certificate of insurance, which listed the location as "work done," and determined the parties intended the policies to cover all work JJA Framing did for Portrait Homes. It did not err by implying that term into the void left by eliminating the scrivener's error. Additionally, the trial court did not err in finding the parties intended to encompass the state and project specific entities like Portrait Homes by listing the names of the parent companies in the policies.

Finally, Penn National argues the trial court improperly considered the Master Agreement because (1) it became effective about six months after Castillo executed the Housing and Purchase Order Contract; (2) it does not mention the Persimmon Hill project; and (3) it only applies prospectively and does not impact preexisting Housing and Purchase Order Contracts. In the order ruling on Penn National's Rule 59(e) motion, the court noted it had "found as a matter of fact that the Master Agreement and the Housing and Purchase Order Contract both apply to the Persimmon Hill project." The court was "unpersuaded by Penn National's contention that the Master Agreement did not apply to the Persimmon Hill project simply because it was signed after the Housing and Purchase Order Contract was initially signed." Further, the court determined, "Even if the Master Agreement . . . [wa]s determined not to have applied to the Persimmon Hill project because [of the timing], two other independent grounds support the [c]ourt's finding that the contract between Portrait Homes and JJA Framing required the additional insured coverage to include completed operations." The court found, "First, the evidence at trial establishes as a matter of fact that there would have been another Master Agreement in place between Portrait Homes and JJA Framing before the Housing and Purchase Order Contract was initially signed." The court also found, "Second, . . . the certificate of insurance . . . relating to additional insured coverage under endorsement 71 11 45 shows that everyone involved . . . believed Portrait Homes was covered for completed operations because endorsement 71 11 45 was attached to the certificate of insurance and was titled 'Automatic Additional Insured -- Owners, Contractors And Subcontractors (*Completed Operations*).'" (emphasis added by trial court). Our standard of review instructs us to affirm the trial court's findings if any evidence supports them. *See Temple*, 381 S.C. at 600, 675 S.E.2d at 415 ("The [c]ourt will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings."). The record contains evidence to support the court's findings as to the Master Agreement. Accordingly, we affirm the award of coverage to Portrait Homes as an additional insured.

### B. Waiver of Right to Contest

Penn National argues the trial court incorrectly concluded Penn National waived its right to contest Portrait Homes' additional insured status. We disagree.

"[A]n insurer [that] has denied coverage on some other basis is precluded from defending against an action on a liability policy on the ground that the insured failed to comply with its requirements as to notice and forwarding of suit papers." *Washington v. Nat'l Serv. Fire Ins. Co.*, 252 S.C. 635, 641, 168 S.E.2d 90, 92

(1969).  "[W]aiver cannot create coverage and cannot bring into existence something not covered in the policy."  *Laidlaw Env't Servs. (TOC), Inc. v. Aetna Cas. & Sur. Co.*, 338 S.C. 43, 53, 524 S.E.2d 847, 852 (Ct. App. 1999) (quoting *Alverson v. Minn. Mut. Life Ins. Co.*, 287 S.C. 432, 434, 339 S.E.2d 140, 142 (Ct. App. 1985)).

The trial court's reason for discussing waiver in this case is unclear.  Penn National did not assert that any policy exclusions barred coverage for Portrait Homes.  Nevertheless, the trial court made clear that it did not rule Portrait Homes was entitled to coverage under the Penn National policies based on the doctrine of waiver.  In the posttrial order, the trial court reiterated that it ruled that Portrait Homes had met its burden of proving it met the requirements to trigger coverage under the additional insured endorsements and the insuring agreements.  Therefore, we affirm as to this issue.  *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct. App. 1987) ("[W]hatever doesn't make any difference, doesn't matter.").

## C. Damages for Breach of Duty to Indemnify

Penn National argues that Portrait Homes sustained no damages for breach of the duty to indemnify because it was fully indemnified by its own insurer.  We disagree.

"[I]f one party is entitled to indemnity from another, the right to indemnity is not defeated by the fact that the loss to be indemnified for was actually paid by an insurance company."  *Otis Elevator, Inc. v. Hardin Constr. Co.*, 316 S.C. 292, 300, 450 S.E.2d 41, 45-46 (1994) (quoting *Tillman v. Wheaton-Haven Recreation Ass'n*, 580 F.2d 1222, 1230 (4th Cir. 1978)).  In *Otis*, our supreme court determined the trial court had erred in reducing the damages the jury awarded by the amount an insurer had paid in settlement.  *Id.* at 300, 450 S.E.2d at 45.

The trial court did not err in determining Portrait Homes sustained damages from Penn National's breach of the duty to indemnify.  Like the trial court, we note that Penn National's argument is not supported by binding South Carolina precedent.  Penn National cites two South Carolina cases that are distinguishable from this case because they dealt with a breach of the duty to defend rather than the duty to indemnify.  Additionally, while Portrait Homes acknowledged that any recovery for Penn National's breach of the duty to indemnify would flow back to Admiral, Portrait Homes would benefit because that would replenish its policy limits with Admiral.  Therefore, the trial court did not err in deciding Portrait Homes sustained damages from the breach of the duty to indemnify.

**D. Bad Faith Claim**

Penn National argues the trial court erred in finding that Portrait Homes proved its bad faith claim. Penn National asserts it did not perform its investigation in bad faith, it did not fail to respond to claim communications, and its incomplete statement of the grounds for denial did not support the bad faith claims. We disagree.

> Bad faith refusal to pay first party benefits under a contract of insurance includes: (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Howard*, 316 S.C. at 451, 450 S.E.2d at 586. "Whether an insurance company is liable for bad faith must be judged by the evidence before it at the time it denied the claim or if the insurance company did not specifically deny the claim by the evidence it had before it at the time the suit was filed." *Id.* at 448, 450 S.E.2d at 584. "An insured may recover damages for a bad faith denial of coverage if he or she proves there was no reasonable basis to support the insurer's decision to deny benefits under a mutually binding insurance contract." *Cock-N-Bull Steak House, Inc.*, 321 S.C. at 6, 466 S.E.2d at 730 (quoting *Dowling*, 303 S.C. 295, 297, 400 S.E.2d 143, 144).

An insurer acts in bad faith when no reasonable basis supports the insurer's decision to contest a claim. *BMW of N. Am., LLC*, 399 S.C. at 453, 731 S.E.2d at 907. "However, whe[n] an insurer has a reasonable ground for contesting a claim, there is no bad faith." *Id.* "Additionally, this good faith obligation includes an insurer's duty to investigate a claim." *Id.* "Importantly, an insured need not prove a breach of an express contractual provision as a prerequisite to bringing a bad faith cause of action." *Id.* Further, "[a]n insurer is not insulated from liability for bad faith merely because there is no clear precedent resolving a coverage issue raised under the particular facts of the case." *Mixson, Inc.*, 349 S.C. at 400, 562 S.E.2d at 662.

Also, "it is axiomatic that an insured must be provided sufficient information to understand the reasons the insurer believes the policy may not provide coverage." *Harleysville Grp. Ins. v. Heritage Cmtys., Inc.*, 420 S.C. 321, 337-38, 803 S.E.2d 288, 297 (2017). "A reservation of rights letter must give fair notice to the insured that the insurer intends to assert defenses to coverage or to pursue a declaratory relief action at a later date." *Id.* at 338, 803 S.E.2d at 297 (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996)). The explanation must be unambiguous and "[g]rounds not identified in the reservation of rights may not be asserted later by the insurer." *Id.* at 339, 803 S.E.2d at 298 (quoting *Desert Ridge Resort LLC v. Occidental Fire & Cas. Co. of N.C.*, 141 F. Supp. 3d 962, 966-68 (D. Ariz. 2015)).

The trial court did not err in finding that Penn National acted in bad faith. The record contains evidence to support the trial court's finding that Penn National failed to respond to Portrait Homes' request for policy benefits for seventeen months. Additionally, Penn National acknowledged in the posttrial hearing its response was untimely. Moreover, Penn National also admitted it provided an inaccurate reason for denying coverage to Portrait Homes. Further, Penn National failed to reasonably investigate Portrait Homes' request for additional insured status because Penn National did not review the underwriting file or other information it had available before it decided to deny coverage. Because evidence supports the trial court's findings, we affirm the court's decision Penn National acted in bad faith.

### E. Punitive Damages

Penn National argues no competent evidence supports the trial court's finding of willful conduct or reckless disregard in support of the punitive damages award. We disagree.

"The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future." *Clark*, 339 S.C. at 378, 529 S.E.2d at 533. "Punitive damages also serve to vindicate a private right of the injured party by requiring the wrongdoer to pay money to the injured party." *Id.* at 378-79, 529 S.E.2d at 533.

The trial [court] is vested with considerable discretion over the amount of a punitive damages award." *Austin*, 358 S.C. at 317, 594 S.E.2d at 877. Appellate

courts' "review of the amount of punitive damages is limited to correction of errors of law." *Id.*

The trial court did not err in awarding punitive damages to Portrait Homes. Many of the trial court's findings that support its bad faith determination also support its determination that Penn National's conduct was willful and reckless. Penn National took seventeen months to respond to Portrait Homes, Penn National sent Portrait Homes an incorrect reason for denying coverage, and Penn National did not review its underwriting file before deciding to deny coverage. Additionally, Gross testified he denied all but one of the roughly thirty claims he handled at Penn National for additional insured status, and the trial court noted that Penn National internally indicated it was likely going to deny coverage two months before any coverage analysis took place. Accordingly, we affirm the award of punitive damages to Portrait Homes.

## III. ISSUES COMMON TO PORTRAIT HOMES AND THE HOA

### A. Time-On-Risk Formula

Penn National argues the trial court failed to apply the supreme court's time-on-risk formula from *Crossmann II* for apportioning damages to Penn National's policy periods. We disagree.

"An insurance company fails to defend at its own peril, but it is obligated to defend only actions involving claims covered by the insuring contract." *Stroup Sheet Metal Works, Inc. v. Aetna Cas. & Sur. Co.*, 268 S.C. 203, 212-13, 232 S.E.2d 885, 888 (1977). "[T]he terms of an insurance policy must be construed most liberally in favor of the insured and where the words of the policy are ambiguous, or where they are capable of two reasonable interpretations[,] that construction will be adopted which is most favorable to the insured." *Kingman v. Nationwide Mut. Ins. Co.*, 243 S.C. 405, 411, 134 S.E.2d 217, 220 (1964). "[T]he provisions of an insurance policy are to be liberally construed in favor of the insured and strictly construed against the company which prepared the policy." *Whittington v. Ranger Ins. Co.*, 261 S.C. 582, 587, 201 S.E.2d 620, 622 (1973).

In *Crossmann II*, our supreme court abandoned the joint and several/all sums approach for determining insurance coverage for progressive property damage cases because that approach ignored "critical language limiting the insurer's obligation to pay to sums that are attributable to property damage that occurred during the policy period." 395 S.C. at 60, 717 S.E.2d at 599. Our supreme court

found that "the scope of an insurer's duty to indemnify was limited to damages accrued during the insurer's time on the risk, overruling earlier case law that held an insurer's liability was joint and several." *Heritage Cmtys., Inc.*, 420 S.C. at 335, 803 S.E.2d at 296 (citing *Crossmann II*, 395 S.C. at 59-64, 717 S.E.2d at 599-601). "An ideal application of the 'time on risk' approach would require the finder of fact to determine precisely how much of the injury-in-fact occurred during each policy period and precisely what quantum of the damage award in the underlying suit was attributable to *that* injury." *Crossmann II*, 395 S.C. at 64, 717 S.E.2d at 601. "Unfortunately, it is often 'both scientifically and administratively impossible' to make such determinations." *Id.* (quoting *Bos. Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 301 (Mass. 2009)).

> In cases where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy, courts have looked to the total loss incurred as a result of all of the property damage and then devised a formula to divide that loss in a manner that reasonably approximates the loss attributable to each policy period.

*Id.* at 64-65, 717 S.E.2d at 602.

However, our supreme court noted that "[t]his formula is not a perfect estimate of the loss attributable to each insurer's time on the risk. Rather, it is a *default rule* that assumes the damage occurred in equal portions during each year that it progressed." *Id.* at 65, 717 S.E.2d at 602. "If proof is available showing that the damage progressed in some different way, then the allocation of losses would need to conform to that proof. However, absent such proof, assuming an even progression is a logical default." *Id.* "[W]he[n] it is impracticable to calculate the exact measure of damages attributable to the injury that triggered each policy, the default rule is that an insurer's pro rata share of the damages is a function of the total number of years damages progressed and the portion of those years a particular insurer provided coverage." *Heritage Cmtys., Inc.*, 420 S.C. at 336, 803 S.E.2d at 296 (citing *Crossmann II*, 395 S.C. at 64-65, 717 S.E.2d at 602).

In *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co. (Crossmann III)*, the trial court "computed the pro rata allocation [of damages] based on a daily loss rather than an annual loss" because one insurer had coverage for less than a year and another had coverage for less than two years. 411 S.C. 506, 522, 769 S.E.2d 453, 462 (Ct. App. 2015). This court found the trial court did not err in the methodology it employed to calculate the time at risk. *Id.*

The court noted, our supreme court in *Crossmann II* ruled that "the default rule is subject to alteration *at the discretion of the trial court*." *Id.*

Here, the trial court did not err in its damages calculations. *Crossmann III* explained that the *Crossmann II* formula is the default rule but the trial court can alter it at its discretion. The trial court found that it needed to modify the time-on-risk analysis in this case because the Penn National policies contained different language than the policies in *Crossmann II*. The trial court noted that the policies stated that "[p]roperty damage which occurs during the period of a Penn National policy 'includes any continuation, change or resumption of that . . . 'property damage' after the end of the policy period." Therefore, the trial court concluded that "the progressive property damage caused by continuous or repeated exposure to water intrusion occurring *after* the end of a policy period is deemed to be included in what is covered by the policy." The trial court determined that the recoverable damages of $3,850,000 exceeded the $500,000 limit of the five Penn National policies and ruled that the total amount covered by the polices was $2,500,000. We find no error in the trial court's reasoning and calculations. Therefore, the trial court did not abuse its discretion in modifying the time-on-risk formula from *Crossmann II*. Accordingly, we affirm as to this issue.

### B. Attorney's Fees

Penn National argues the trial court improperly awarded Portrait Homes and the HOA attorney's fees. It contends Castillo and JJA Construction incurred no attorney's fees. It also asserts Penn National owed the HOA no duty to defend. It further contends Portrait Homes was defended in the underlying case and does not satisfy the requirements of *Hegler*.[24] It further contends South Carolina courts "have not awarded attorneys' fees as consequential damages in [insurance bad faith] tort actions." It also asserts the HOA's request for an additional contingency fee goes far beyond the scope of *Hegler*. We disagree.

Generally, attorney's fees are not recoverable unless authorized by contract or statute. *Baron Data Sys., Inc. v. Loter*, 297 S.C. 382, 383, 377 S.E.2d 296, 297 (1989). The award of attorney's fees under a contract is left to the discretion of the trial court and will not be disturbed unless the court abused that discretion. *Id.* at 384, 377 S.E.2d at 297. "An abuse of discretion occurs when the decision is controlled by some error of law or is based on findings of fact that are without

---

[24] *Hegler v. Gulf Ins. Co.*, 270 S.C. 548, 550-551, 243 S.E.2d 443, 444 (1978).

evidentiary support." *Degenhart v. Burriss*, 360 S.C. 497, 500, 602 S.E.2d 96, 97 (Ct. App. 2004).

> The determination of whether statutory attorney fees should be awarded is treated as one in equity. *See Brown v. State Farm Mut. Ins. Co.*, 275 S.C. 276, 269 S.E.2d 769 (1980) (wherein the supreme court treated as equitable the trial court's determination of whether to award attorney fees under . . . [section] 38-9-320 [of the South Carolina Code] (1976) for bad faith failure to pay insurance claim).

*Kilcawley v. Kilcawley*, 312 S.C. 425, 427, 440 S.E.2d 892, 893 (Ct. App. 1994).

"In reviewing the award in issue, therefore, this court may take its own view of the preponderance of the evidence." *Id.* "Even whe[n] this court may find facts in accordance with its own view of the preponderance of the evidence, we are not required to disregard the factual findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility and demeanor." *Id.*

"An insurer is liable to the policy holder for all reasonable attorneys' fees for the prosecution of the case against the insurer if the trial judge finds the refusal to pay the policyholder's claim was without reasonable cause or in bad faith." *Mixson, Inc.*, 349 S.C. at 400-01, 562 S.E.2d at 663 (citing S.C. Code Ann. § 38-59-40 (Supp. 2001)). "Determination of an insurer's liability for attorneys' fees pursuant to . . . section 38-59-40 . . . is a matter for decision by the trial judge. In making this determination, the trial judge must ascertain whether or not an insurer's refusal to pay a claim was without reasonable cause or in bad faith." *Dorman v. Allstate Ins. Co.*, 332 S.C. 176, 181, 504 S.E.2d 127, 130 (Ct. App. 1998) (citations omitted). "The factual finding of unreasonableness or bad faith is a condition precedent to an award of attorney's fees under . . . section [38-59-40]." *Flynn v. Nationwide Mut. Ins. Co.*, 281 S.C. 391, 393, 315 S.E.2d 817, 819 (Ct. App. 1984). "The determination of whether attorney's fees should then be awarded is one in equity, made without the aid of a jury. Thus, we are free to find facts in accordance with our view of the preponderance of the evidence." *Id.*

In *Town of Winnsboro v. Wiedeman-Singleton, Inc.*, 307 S.C. 128, 131, 414 S.E.2d 118, 120 (1992), our supreme court allowed a contractor to recover attorney's fees and costs expended in defending the negligence of its subcontractor when the subcontractor negligently performed its contract with the contractor and because of

that negligence and breach of contract directed toward the contractor, the contractor was forced to defend an action.

In *Addy v. Bolton*, 257 S.C. 28, 33, 183 S.E.2d 708, 709 (1971), the supreme court noted "the lossors seek to recover from the contractor the attorneys' fees incurred by them in defending themselves against the claim asserted by the tenants." The court determined, "The weight of authority sustains their right of recovery, either on the theory of an implied contract to indemnify, or because they were put to the necessity of defending themselves against the lessees' claim by the tortious conduct of the contractor, or by his breach of contract." *Id.*

The supreme court explained:

> It is generally held that where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages. In order to recover attorneys' fees under this principle, the plaintiff must show: (1) that the plaintiff had become involved in a legal dispute either because of a breach of contract by the defendant or because of defendant's tortious conduct; (2) that the dispute was with a third party—not with the defendant; and (3) that the plaintiff incurred attorneys' fees connected with that dispute. If the attorneys' fees were incurred as a result of a breach of contract between plaintiff and defendant, the defendant will be deemed to have contemplated that his breach might cause plaintiff to seek legal services in his dispute with the third party.

*Id.* at 33, 183 S.E.2d at 709-10 (quoting 22 Am. Jur. 2d *Damages* § 166).

In *Hegler*, the supreme court looked at the right to recover attorney's fees under contract. 270 S.C. at 549-51, 243 S.E.2d at 444. The supreme court found that attorney's fees should have been awarded "for the defense of the declaratory action brought by [the insurer] to avoid coverage under the policy." *Id.* at 549, 243 S.E.2d at 444. The supreme court stated:

> The applicable policy provisions require the [insurer] (1)
> to pay on behalf of [the insured] all sums which [the
> insured] shall become legally obligated to pay as
> damages because of bodily injury or property damage,
> and (2) "to defend any suit against the insured . . .
> seeking damages on account of such bodily injury or
> property damage, even if any of the allegations of the suit
> are groundless, false[,] or fraudulent."

*Id.* at 549-50, 243 S.E.2d at 444.

The supreme court noted that "[w]hile [the insurer] agreed, under a reservation of rights, to defend the action for damages brought against [the insured], it simultaneously brought the declaratory judgment action seeking a determination that it was not liable under the policy or obligated to defend." *Id.* at 550, 243 S.E.2d at 444. The court found the insured "was, therefore, forced to employ counsel to defend against [the insurer's] denial of any obligation to continue the defense of the damage action." *Id.* The supreme court stated, "The declaratory judgment action established [the insurer's] obligation under the policy to defend the action for damages. If [the insurer] had refused initially to defend, it would undoubtedly have been liable for the payment of counsel fees incurred by [the insured] in the defense of the damage action." *Id.* The supreme court observed the insurer did not refuse from the beginning, but instead "began the defense and then sought, through the declaratory judgment action, to avoid any obligation to continue to defend." *Id.* The court found the insured had "to employ counsel to resist the contention by [the insurer] of lack of coverage" "[i]n order to obtain [the insurer's] continued defense of the action for damages." *Id.*

The supreme court held:

> There is no material difference in the legal effect between
> an outright refusal to defend and in undertaking the
> defense under a reservation of rights until a declaratory
> judgment is prosecuted to resolve the question of
> coverage. In either event, an insured must employ
> counsel to defend in the first instance in the damage
> action and in the second in the declaratory judgment
> action to force the insurer to provide the defense. In

both, the counsel fees are incurred because of the
insurer's disclaimer of any obligation to defend.

*Id.*

The court determined in *Hegler* "[t]he action of [the insurer] amounted to a wrongful breach of its contractual obligation to defend." *Id.* "The legal fees incurred by [the insured], in successfully asserting his rights against [the insurer's] attempt in the declaratory judgment action to avoid its obligation to defend, were damages arising directly as a result of the breach of the contract." *Id.* at 550-51, 243 S.E.2d at 444.

"Courts applying South Carolina bad faith law have not awarded attorney's fees as consequential damages in tort actions." *JT Walker Indus., Inc.*, 554 F. App'x at 191. The only case that speaks directly to this issue is a federal district court case in which "the court held that a plaintiff could not recover attorney's fees incurred in prosecuting a bad faith insurance claim." *Id.* (citing *Andrews v. Cent. Sur. Ins. Co.*, 271 F. Supp. 814, 821 (D.S.C. 1967)).

"Our case law and court rules make clear that when a contract or statute authorizes an award of attorney's fees, the trial court must make specific findings of fact on the record for each of the required factors to be considered." *Griffith v. Griffith*, 332 S.C. 630, 646, 506 S.E.2d 526, 534-35 (Ct. App. 1998). The factors a trial court should consider in determining reasonable attorney's fees are "(1) nature, extent, and difficulty of the legal services rendered; (2) time and labor devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) fee customarily charged in the locality for similar services; and (6) beneficial results obtained." *Blumberg v. Nealco, Inc.*, 310 S.C. 492, 494, 427 S.E.2d 659, 660 (1993).

"Where an attorney's services and their value are determined by the trier of fact, an appeal will not prevail if the findings of fact are supported by *any* competent evidence." *Williamson v. Middleton*, 374 S.C. 419, 431, 649 S.E.2d 57, 64 (Ct. App. 2007) (quoting *Baron Data Sys., Inc.*, 297 S.C. at 384, 377 S.E.2d at 296), *aff'd in part, rev'd in part*, 383 S.C. 490, 681 S.E.2d 867 (2009).

The trial court did not err in the award of attorney's fees to Portrait Homes. In *Hegler*, our supreme court decided that "legal fees incurred by [the insured], in successfully asserting his rights against [insurer's] attempt in the declaratory judgment action to avoid its obligation to defend, were damages arising directly as

a result of the breach of the contract." 270 S.C. at 550-51, 243 S.E.2d at 444. Here, the trial court found Penn National breached its duties to defend and indemnify Portrait Homes and Portrait Homes sustained damages as a result. Therefore, the trial court was permitted to award attorney's fees. In the posttrial motions and punitive damages order, the trial court found (1) presentation of the issues was not a simple task; (2) the amount of time and labor devoted to the case was reasonable; (3) Portrait Homes' attorney tried the case in a competent, well-prepared manner; (4) the contingency of compensation did not apply because the fee agreement was a billable hour arrangement; (5) the hourly rate of $250, as well as a rate of $125 for travel, was within the range of customarily charged in the area; and (6) the results were very beneficial. The trial court awarded to Portrait Homes attorney's fees of $237,462.50 and costs of $12,540.76 for a total of $250,003.26. This award is reasonable. Accordingly, we affirm the award of attorney's fees to Portrait Homes.

As to the HOA, the trial court's award of attorney's fees was for the assigned breach of duty to defend and duty to indemnify. The court indicated case costs of $51,332.03 and attorney's fees of $1,790,049.10 were reasonable and "*would be awarded should the HOA have elected* the remedy of Breach of the Duty to Defend and Indemnify." The trial court noted the HOA filed an election of remedies, electing to recover for the bad faith and the breach of the duty of good faith and fair dealing rather than the breach of the duty to defend and duty to indemnify. The court recognized the supreme court has held attorney's fees under section 38-59-40 only apply to breach of contract actions. Accordingly, because the trial court did not actually award the HOA attorney's fees based on the HOA's election, we need not address the arguments concerning the HOA's attorney's fees. *See Finley*, 294 S.C. at 4, 362 S.E.2d at 28 ("[W]hatever doesn't make any difference, doesn't matter.").

**CONCLUSION**

For the forgoing reasons, the learned trial court's orders are

**AFFIRMED.**

**VINSON, J., and LOCKEMY, A.J., concur.**